```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE MIDDLE DISTRICT OF FLORIDA
 2                      ORLANDO DIVISION

 3           Case no.:  6:12-cr-63-Orl-31GJK

 4   UNITED STATES OF AMERICA,        )     Orlando, Florida
                                      )     December 3, 2013
 5                   Plaintiff,       )     9:00 a.m.
                                      )
 6                      v.            )
                                      )
 7   MARCUS DWAYNE ROBERTSON,         )
                                      )
 8                   Defendant.       )
     _____    )

 9

10

11

12              Transcript of a non-jury trial

13          before the Honorable Gregory A. Presnell

14            United States District Court Judge

15

16

17   Appearances:

18   Counsel for Plaintiff:  Roger B. Handberg, III

19

     Counsel for Defendant:  Daniel N. Brodersen
20                            Corey I. Cohen

21

     Court Reporter:         Diane C. Peede, RMR, CRR
22                           United States Courthouse
                             401 West Central Blvd., #4600
23                           Orlando, Florida  32801
                             (407) 615-0305
24

     Proceedings recorded by mechanical stenography, transcript
25   produced by computer.
```

1                           Index of Transcript

2                                                        **Page**

3      **Government waives opening statement**                **4**

4      **Government rests**                                   **5**

5      **Opening statement**
       **By Mr. Brodersen**                                  **8**
6

7                         **Marcus Dwayne Robertson**
       **Direct by Mr. Brodersen**                          **12**
8      **Cross by Mr. Handberg**                             **55**
       **Redirect by Mr. Brodersen**                         **99**
9

10                            **Michael Bell**
       **Direct by Mr. Brodersen**                          **103**
11

12                            **Itisha Wills**
       **Direct by Mr. Brodersen**                          **106**
13     **Cross by Mr. Handberg**                             **113**
       **Redirect by Mr. Brodersen**                         **122**
14

15     **Defense rests**                                     **124**

16                        - - - - - - - -

17

18
                        **Government's Exhibits in evidence**
19
       **1, 1-A, 1-B, 1-C, 1-D, 1-E, 2, 3-A,**
20     **3-B, 3-C, 4-A, 4-B, 4-C, 4-D, 4-E,**
       **4-F, 4-G, 5-A, 5-B, 5-C**                            **5**
21

22                      **Defendant's Exhibit in evidence**

23     **1**                                                  **7**

24

25

                                         *Diane Peede, RMR, CRR (407) 615-0305*

1              P R O C E E D I N G S

2              THE COURT:  Lisa, if you'd call the case.

3              THE COURTROOM DEPUTY:  This is in the matter of the

4    United States of America versus Marcus Dwayne Robertson, case

5    number 6:12-criminal-63-Orlando-31GJK.

6              THE COURT:  All right.  And appearing for the

7    government?

8              MR. HANDBERG:  Good morning, Your Honor.  Roger

9    Handberg on behalf of the United States.  With me is Don

10   Metzger with the Internal Revenue Service.

11             THE COURT:  And for the defendant?

12             MR. BRODERSEN:  Good morning, Your Honor.  Daniel

13   Brodersen here on behalf of Marcus Dwayne Robertson, who is

14   to my right.

15             MR. COHEN:  And, Judge, Corey Cohen.  I'm

16   co-counsel on the case for Mr. Robertson.

17             THE COURT:  All right.  We're here today for the

18   trial of this case.  The parties waived a jury trial.  So

19   we're proceeding before the court without a jury.

20             Are there any preliminary matters I need to

21   address?

22             MR. HANDBERG:  Not from the United States, Your

23   Honor.

24             THE COURT:  Mr. Brodersen?

25             MR. BRODERSEN:  No, sir.

4

```
 1            THE COURT:  All right.  Do you want to give an
 2  opening, Mr. Handberg?
 3            MR. HANDBERG:  I waive opening, Your Honor.
 4            THE COURT:  Mr. Brodersen?
 5            MR. BRODERSEN:  Your Honor, I will reserve opening
 6  to the beginning of our case.
 7            THE COURT:  All right.
 8            Mr. Handberg.
 9            MR. HANDBERG:  Yes, Your Honor.  At this point I'm
10  going to enter into evidence the stipulation of the parties
11  that was filed on October 31st of this year at docket 208;
12  and pursuant to that stipulation, I'm going to offer into
13  evidence the exhibits that are identified in that
14  stipulation, the parties, which are Government Exhibits 1-A,
15  1-B --
16            THE COURT:  Hold on a second.  Let me get your
17  stipulation here.
18            The stipulation itself, you want to offer as an
19  exhibit?
20            MR. HANDBERG:  Yes, I would, Your Honor.
21            THE COURT:  So Government's Exhibit Number 1?
22            MR. HANDBERG:  Yes, sir.
23            THE COURT:  And, Mr. Brodersen, you have no
24  objection to that?
25            MR. BRODERSEN:  No, Your Honor.  We stipulate it.
```

1          THE COURT:  All right.  Government's Exhibit

2   Number 1, which is the stipulation of the parties appearing

3   at document number 208, is admitted in evidence.

4          Mr. Handberg, the exhibits, then, that you want

5   offered in conjunction therewith are what?

6          MR. HANDBERG:  Government's Exhibits 1-A, 1-B, 1-C,

7   1-D, 1-E, 2, 3-A, 3-B, 3-C, 4-A, 4-B, 4-C, 4-D, 4-E, 4-F,

8   4-G, 5-A, 5-B, 5-C.  So the exhibits that are identified on

9   pages one and two of the stipulation, I offer those into

10   evidence.

11          THE COURT:  Is there any objection, Mr. Brodersen?

12          MR. BRODERSEN:  No, Your Honor.  We stipulate it.

13          THE COURT:  All right.  Government's Exhibit 1-A

14   through E, inclusive, Exhibit 2, Exhibit 3-A, B and C,

15   Exhibits 4-A through G, inclusive, and 5-A through C,

16   inclusive, are admitted.

17          MR. HANDBERG:  The United States rests, Your Honor.

18          THE COURT:  Okay.

19          MR. BRODERSEN:  Your Honor, in connection with

20   Government's Exhibit 3-A, under Federal Rule of Evidence 106,

21   we would ask that the entire recording of that particular

22   telephone conversation be entered into evidence along with

23   the entire transcript, under the rule of completeness.

24          MR. HANDBERG:  The entire recording is included in

25   Government's Exhibit 3-A.  The transcript that has been

1  admitted is the part that relates -- is the part that is

2  summarized in the stipulation; and the reason why I did that

3  was, as part of the agreement for the bench trial in this

4  case, the United States has agreed not to introduce any of

5  the evidence that was identified in the Rule 404(b) notice,

6  and to be consistent with that spirit, I have included --

7  because there's arguably parts of that conversation that go

8  into other issues implicated by that notice.  So I thought,

9  in the spirit of that, we would just introduce the transcript

10  of the pertinent portion; but the audio, the entire audio, is

11  admitted as an exhibit.  So I think the rule of completeness

12  has been satisfied.

13          MR. BRODERSEN:  Your Honor, I have two points to

14  raise in response to what the government says, and I

15  understand the government's position.  Part and parcel of the

16  stipulation and the agreement to waive a jury trial in this

17  case was part of an overall agreement that the 404 -- the

18  proposed 404(b) evidence would not be utilized at this

19  proceeding, and I suppose -- and I think Mr. Handberg used

20  the word "arguably."

21          There's some indication in this phone call of

22  information which would implicate that proposed 404(b)

23  notice.  However, because the entire recording is being

24  entered into evidence, we would ask that the entire

25  transcript be entered into evidence also in the event that

1    the Court wanted to review it prior to rendering a verdict in

2    this case.  And I do have a copy of the entire transcript.

3             THE COURT:  I mean, that's fine.  I don't think Mr.

4    Handberg objects to that.  They were trying to accommodate

5    your concerns.  And if you don't have a problem with it, I

6    don't have a problem with it.

7             MR. HANDBERG:  I don't have a problem with it, Your

8    Honor.  If it's them who wants to introduce it, that's

9    certainly fine with me.

10            THE COURT:  All right.  We'll introduce the entire

11   transcript of the June 17th call as Defendant's Exhibit 1.

12            MR. HANDBERG:  This is the one I previously

13   produced in discovery to the defense.

14            THE COURT:  All right.  That would be Defendant's

15   1, then.

16            MR. BRODERSEN:  Should I approach, Your Honor, and

17   have it marked?

18            THE COURT:  Sure.  That's fine.

19            MR. BRODERSEN:  Thank you, Your Honor.

20            THE COURT:  Okay.

21            All right.  Well, the government has introduced its

22   evidence by the stipulation and exhibits and has rested.

23            So, Mr. Brodersen, what says the defendant?

24            MR. BRODERSEN:  Your Honor, I have a brief opening

25   I'd like to make prior to calling witnesses.

1            THE COURT:  Sure.

2            MR. BRODERSEN:  Judge, as you can see and you just

3    heard, the government and the defense have stipulated to the

4    introduction and admission in consideration by the Court of

5    virtually all the facts in this case that give rise to the

6    charge of conspiracy.  In fact, it's my -- it's my belief and

7    understanding --

8            THE COURT:  If you are going to talk, go up to the

9    podium.

10           MR. BRODERSEN:  In fact, it's my belief and

11   understanding that the only fact or only issue before the

12   Court as fact-finder today is whether Mr. Robertson willfully

13   participated in the charged conspiracy; and it's our

14   contention that the evidence, when you hear all of it, will

15   demonstrate that he did not act willfully in this case as to

16   the filing of the false tax return which gave rise to the

17   false claim for a tax refund.

18           You'll hear testimony from Mr. Robertson himself,

19   some testimony related to his background and his belief as to

20   the reason why this prosecution -- investigation and

21   prosecution was initiated.  You'll hear testimony regarding

22   his relationship with the co-defendant, Mr. Jimenez, and how

23   that relationship arose and came to be and came to be here in

24   Orlando, Florida.

25           You'll hear testimony that Mr. Robertson, while he

required Mr. Jimenez to file a tax return while Mr. Jimenez

lived in his home because Mr. Robertson believed in the law

and believed that every individual who is required to file a

tax return, should file a tax return.  So he required him to

file a tax return, but he certainly did not instruct him or

require him to list three of Mr. Robertson's daughters on the

tax return, which is the basis for the false claim for a

refund in this case.

          In fact, what Mr. Robertson did is he sent Mr.

Jimenez to an individual by the name of Tony Osias; and Tony

Osias, to Mr. Robertson's understanding, was a qualified tax

return preparer and Mr. Osias had prepared tax returns for

Mr. Robertson previously, had prepared tax returns for Mr.

Robertson's family and in fact -- and prepared these tax

returns during the same year, the 2010 tax year, that the

false return that Mr. Jimenez filed was prepared.  Mr.

Robertson will testify that he relied on Tony Osias to

prepare a proper and legal and lawful tax return.

          It was not until after the tax return was filed and

the refund was generated that Mr. Robertson discovered that

Mr. Jimenez and Mr. Osias had utilized three of Mr.

Robertson's daughters on the tax return, and that -- and in

fact Mr. Robertson became very upset about that fact and he,

you know, conveyed his anger or I should say the fact that he

was upset to Mr. Osias.  He conveyed it to his -- one of his

1    wives, Itisha Wills, and he was upset that these children --

2    his children were utilized on the tax return.

3         You'll hear testimony that he was not involved in

4    the financial details of either his personal life or his

5    business life, which you'll hear about.

6         You'll also hear testimony that with the exception

7    of some money that was borrowed from Mr. Jimenez as is

8    evidenced by an I.O.U., which is entered into evidence in

9    this case, Mr. Robertson did not share in the tax refund

10   proceeds in this case.

11        It's my understanding that the government intends

12   to rely on -- and perhaps you'll hear from Mr. Handberg in

13   closing argument that a couple of statements that Mr.

14   Robertson made in the taped phone call on June 17th of 2011

15   that Mr. Robertson had had with an individual named Mustafa

16   in New York and a statement that he made on the day that he

17   was arrested, prior to his arrest, to Mr. Osias are

18   indicative of the fact that he knew that the use of his

19   children was illegal and that he had somehow authorized the

20   use of his children.

21        You'll hear his testimony regarding these

22   statements, and we believe that this testimony is consistent

23   with the fact that while he required Mr. Jimenez to file a

24   tax return, he did not require or authorize him to utilize

25   his children on the tax return.

1            It's our belief, Your Honor, that despite the fact

2    that we agree with all of the evidence that has been entered

3    thus far and we've in fact stipulated to it, that we do not

4    agree and the evidence will not demonstrate that Mr.

5    Robertson acted willfully as it relates to the charges in

6    this case; and it's incumbent upon the government to prove,

7    as you know, beyond a reasonable doubt that Mr. Robertson

8    willfully participated in the conspiracy; and when you hear

9    all of the evidence in this case, we're confident that you

10   will find that he did not act willfully.

11            THE COURT:  All right.  Thank you, sir.

12            MR. HANDBERG:  Your Honor, I'm going to invoke the

13   rule.

14            THE COURT:  Okay.  The government has invoked the

15   rule to sequester witnesses.  So any of these people who

16   intend to testify need to exit the courtroom and not discuss

17   in any manner the case or the testimony until they're called

18   to the stand.

19            MR. BRODERSEN:  Your Honor, at this point the

20   defense would call Marcus Dwayne Robertson.

21            THE COURT:  Mr. Robertson, do you want to come on

22   up here, please sir.

23            THE COURTROOM DEPUTY:  Please raise your right

24   hand.

25            THE COURT:  Just pause briefly here and she's going

1   to administer the oath to you.

2            THE DEFENDANT:  Yes, sir.

3                    MARCUS DWAYNE ROBERTSON,

4   having been first duly sworn, was examined and testified as

5   follows:

6            THE COURTROOM DEPUTY:  Thank you, sir.  You may be

7   seated.

8                    DIRECT EXAMINATION

9   BY MR. BRODERSEN:

10  Q.    Good morning, sir.  Could you please state your name.

11  A.    Yes.  My legal name is Marcus Dwayne Robertson.

12  Q.    Now, Mr. Robertson, are you presently known by any other

13  names?

14  A.    Yes, sir, I am.

15  Q.    And what other names are you known by?

16  A.    Taalib Abdus-Salam, Mukhlis Ibnessah, Mukhlis Binlonzo,

17  Mukhlis Robertson, Mukhlis Alonzo.

18  Q.    And those are -- are those names that you have utilized

19  over the years?

20  A.    Yes, sir.

21  Q.    Okay.  Are you presently known by any other name other

22  than Marcus Robertson?

23  A.    Yes, Abu-Taubah.

24  Q.    Okay.  How did you come to be known by the name

25  Abu-Taubah?

1    A.    When in '91 or 1990 I was convicted of some crimes and

2    then in '95 I started teaching at an Islamic school and the

3    people said -- they started to say, you know, "You are

4    Abu-Taubah.  You are the person that needs to make the most

5    taubah," and that's what Abu-Taubah means, the person that

6    needs to remember to make repentance.  So I agreed with that,

7    and everybody has since called me Abu-Taubah.

8    Q.    Now, are you a member of the Islamic religion?

9    A.    Yes, I'm a Muslim.

10   Q.    Okay.  Is that -- Abu-Taubah your Muslim name?

11   A.    No.  It's my nickname.  My -- my -- my name is -- my

12   Muslim name is Mukhlis.

13   Q.    Now, Mr. Robertson, where were you born?

14   A.    I was born in Brooklyn, New York.

15   Q.    Okay.  And did you attend high school in Brooklyn?

16   A.    Yes, sir.

17   Q.    After high school, what did you do?

18   A.    After high school, I joined the United States Marine

19   Corps.

20   Q.    Okay.  And when did you become a Muslim?

21   A.    I became a Muslim when I was about twelve years old.

22   Q.    Okay.  And so when you joined the United States Marine

23   Corps, you were already a Muslim?

24   A.    Yes, sir.

25   Q.    What assignment did you first receive when you finished

1   basic training with the Marine Corps?

2   A.    When I got out of basic training, I became a member of

3   what they called at that time special ops, special operations

4   capable or command.  It was Second Force Reconnaissance

5   Company.  It was a response to the Iran hostage thing.  So we

6   did extremist hostage rescue or counter-terrorism.

7   Q.    Okay.  And where were your posts?  What was your first

8   post of duty?

9   A.    My first post was Camp LeJeune, North Carolina.

10  Q.    And how long, approximately, were you at Camp LeJeune?

11  A.    Most of my time, it was about three years, was in Camp

12  LeJeune.  That was the main post.

13  Q.    And what was your next post?

14  A.    Okinawa, Japan.

15  Q.    Okay.  And did you remain in the Second Reconnaissance

16  Force when you were in Okinawa?

17  A.    No.  Every time you transferred from one duty station to

18  the next, the name of the command, but I was still in

19  reconnaissance.  I was in third reconn battalion --

20  Q.    Okay.  And --

21  A.    -- which is. . .

22  Q.    Go ahead.

23  A.    I'm sorry -- which is the Japanese force or the Asian

24  force for that part of the world.

25  Q.    And how long did you remain in Okinawa?

1    A.    Approximately a year.

2    Q.    Okay.  What happened after that year in Okinawa?

3    A.    After that year in Okinawa, I came back to New York, the

4    United States.

5    Q.    Did you leave the United States Marine Corps?

6    A.    Sir, I transferred over to the Reserves.

7    Q.    Okay.  And ultimately did you receive a discharge from

8    the Marine Corps?

9    A.    Yes, sir, an honorable discharge in 1994.

10   Q.    Okay.  Now, when you returned to New York, this was

11   approximately in 1991?

12   A.    No.  In 1990, sir.

13   Q.    Okay.  And what did you find yourself doing back in

14   New York?

15   A.    Well, when I came back to New York, I started working

16   security, that type of thing, but that's when I got into a

17   life of crime.

18   Q.    Okay.  Was there -- that was going to be my next

19   question.  Was there a point in time when you began to get

20   yourself into trouble?

21   A.    Yes, sir.

22   Q.    Okay.  And did that trouble ultimately result in you

23   being convicted of federal crimes?

24   A.    Yes, sir.  In -- I was arrested in 1991.  And in 1990 --

25   I began cooperating with the government in 1991, and I pled

1  guilty to a superseding information and was sentenced in

2  1994.

3  Q.   Okay.  So you pled guilty in 1991 but were not sentenced

4  until 1994?

5  A.   I pled guilty to zero to life in 1991.

6  Q.   Okay.

7  A.   And I didn't know what the sentence was going to be.

8  Q.   Okay.  And after you entered into your plea, for a

9  period of years did you cooperate with the government?

10  A.   Yes, sir, I did.

11  Q.   And did you provide testimony at federal criminal

12  trials?

13  A.   Yes, numerous federal criminal trials and also I helped

14  against different terrorist organizations that were in the

15  communities at that time.

16  Q.   Okay.

17  A.   The Meir Kahane assassination, the tunnel bombing, a

18  number of those types of situations at that time.

19  Q.   And as a result, when you were sentenced, did you

20  receive credit for the cooperation and assistance you

21  provided to the government?

22  A.   Yes, sir, I did.

23          MR. HANDBERG:  Objection; relevance, Your Honor.

24          THE COURT:  I don't see it yet, but we'll go --

25          MR. BRODERSEN:  I thought it would be beneficial

1   for the Court to get an idea of Mr. Robertson's background,

2   Your Honor.  That's all.

3           THE COURT:  Okay.

4   BY MR. BRODERSEN:

5   Q.   The -- what was your sentence that you received in 1994?

6   A.   Time served, pretty much.  Four years, the time served.

7   Q.   Okay.  Now, after you were released -- or pardon me.

8   After you were sentenced, did there come a point in time when

9   you became part of the government's WITSEC Program?

10  A.   Yes, sir.

11          MR. HANDBERG:  Objection; relevance, and

12  information related to that program is specifically precluded

13  from any sort of disclosure.  There's criminal penalties with

14  respect to that, Your Honor.

15          MR. BRODERSEN:  I don't intend to go into any --

16          MR. HANDBERG:  Well, you just did.

17  A.   We're going to -- you know, it's important because

18  it's --

19          THE COURT:  Wait a minute.  Wait a minute.  He's

20  your lawyer.

21          MR. BRODERSEN:  Yes.

22          THE COURT:  You answer questions.  I make

23  decisions.

24          THE WITNESS:  Yes, sir.

25          THE COURT:  Okay.

1          MR. BRODERSEN:  Given the government's objection,

2    I'm going to go ahead and withdraw my question.

3          THE COURT:  I think that would be advisable.

4          MR. BRODERSEN:  Okay.

5    BY MR. BRODERSEN:

6    Q.    Now, Mr. Robertson, for the next several years did you

7    live in different places in the United States?

8    A.    Yes, sir.

9    Q.    Okay.  Did you live in Missouri?

10   A.    Yes, sir.

11   Q.    Okay.  And in Missouri, did you pursue the development

12   of your Islamic education?

13   A.    Yes, sir.  I became a teacher at the I.S.K.C., Islamic

14   School of Kansas City.

15   Q.    Okay.  And how long were you at the Islamic School of

16   Kansas City?

17   A.    Approximately four years.

18   Q.    Did you receive a degree of sorts?

19   A.    No.  I was a teacher.  I was the dean at the school.

20   Q.    Okay.  You were a teacher to begin with and then you

21   ultimately rose to dean?

22   A.    Right.  Yes, sir.

23   Q.    Okay.  And did there come a point in time then when,

24   after you were in Missouri, that you lived in Oklahoma?

25   A.    Yes, sir.

1    Q.    Okay.  And after you resided in Oklahoma, did you have

2    occasion to relocate to abroad, to overseas?

3    A.    Yes.  I moved to Senegal, and then after Senegal to

4    Mauritania.

5    Q.    Okay.  And Senegal and Mauritania both being in West

6    Africa?

7    A.    Yes, West Africa.

8    Q.    While in Mauritania, did you pursue your Islamic

9    education?

10   A.    Yes, sir.  I was enrolled in the Islamic Institute of

11   Morkora (phonetic).

12   Q.    Okay.  And for how long did you attend --

13   A.    Approximately three years.

14   Q.    Try to let me finish my question before you --

15   A.    Sorry, sir.

16   Q.    That's okay.  And what did you study in Mauritania?

17   A.    I studied Arabic and Islamic law.

18   Q.    Okay.  And did you receive a degree?

19   A.    Yes.

20   Q.    And what sort of degree did you receive?

21   A.    In Arabic, it's called an ijazah, and it's permission --

22   it's like a bachelor's or a master's.  You can have

23   permission to teach.

24   Q.    Permission to teach what?

25   A.    Islamic law and Arabic sciences.

1    Q.    And did you have occasion after that to teach Islamic

2    law and Arabic sciences?

3    A.    Yes, sir.

4    Q.    Now, after you lived in Mauritania, did you move to

5    Egypt?

6    A.    Yes, sir.

7    Q.    Okay.  And where in Egypt did you move to?

8    A.    I moved to Tondo (phonetic).

9    Q.    Okay.  And by this time did you have any children?

10   A.    Yes, sir, I did.

11   Q.    How many children did you have?

12   A.    Approximately four children.

13   Q.    Okay.  And did you have a wife?

14   A.    Yes, I had two wives.

15   Q.    Okay.  Explain to the Court what the -- the reason why

16   you had two wives.

17   A.    Well, in Islam, the -- well, it's not necessarily

18   started by Islam.  Christianity and Judaism both have

19   polygamy, multiple wives.  Islam just restricts it to four

20   women.  And that is because there are more women than men,

21   and the woman, of course, need to have companionship, just

22   like the men.  So polygamy is allowed in Islam, though it's

23   regulated.

24           I was married to one lady that I'm still married to

25   now, and at the time there was another lady that I had met

1    through my work at the -- I was working at Jackson County

2    Jail and at Leavenworth Penitentiary as the chaplain; and so

3    through that, I met this other individual and we got married,

4    and we were all overseas in Egypt.

5    Q.    By the time you were in Egypt, did you have children

6    with both of your wives?

7    A.    Yes, sir.

8    Q.    And what did you do while you were in Egypt?

9    A.    I was the program director for the research department

10   for a major Islamic book publisher.   So they published books

11   in English, and I Americanized those books.   That was part of

12   what I did while I was there.   The other time, I was working

13   with the government.

14   Q.    Now, did you -- did you pursue the development of your

15   Islamic education while you were in Egypt?

16   A.    Yes.   I worked -- I was at Ashart (phonetic) School

17   there, the institute for memorization of Koran.

18   Q.    Okay.

19   A.    Shall I elaborate?

20   Q.    Yeah.

21   A.    When I got to Egypt, the amni dhola (phonetic), which is

22   the secret police there or the F.B.I. --

23          MR. HANDBERG:   Objection, Your Honor; relevance,

24   and to the extent -- I don't know where the witness is going

25   with this, but to the extent the witness is attempting to get

1     into anything that potentially might be classified, there's

2     been no proper notice provided with respect to any such

3     material under CEPA.

4               THE COURT:  Sustained.

5     BY MR. BRODERSEN:

6     Q.   If you could, confine yourself to what you did in terms

7     of pursuing your Islamic education while you were in Egypt

8     and refrain from discussing any matters pertaining to the

9     government.

10    A.   Sure.  I was contacted by -- I don't know how to say it.

11    I was contacted by government officials.

12              MR. HANDBERG:  Objection.  The same objection, Your

13    Honor.

14    BY MR. BRODERSEN:

15    Q.   Again, what did you -- what institute did you attend

16    while you were there?

17              MR. HANDBERG:  And at this point I'm going to renew

18    my overall objection to relevance.  We're only in the early

19    2000s on a tax case that relates to 2010.

20              THE COURT:  Sustained.

21              MR. BRODERSEN:  I'll move it along, Your Honor.

22              THE COURT:  Let's get to the issued involved in the

23    lawsuit, Mr. Brodersen.

24    BY MR. BRODERSEN:

25    Q.   After you resided in Egypt, Mr. Robertson, did there

1    come a point in time when you returned with your family

2    ultimately to the United States?

3    A.    Yes, sir.

4    Q.    Okay.  And when you returned, where did you first

5    reside?

6    A.    When I returned, I reside -- I was homeless.  So I went

7    to a shelter.  I moved into a shelter.

8    Q.    Did there come a point in time when you found yourself

9    in Los Angeles, California?

10   A.    Yes, for period of time I was working in Los Angeles.

11   Q.    And how long were you in Los Angeles?

12   A.    Approximately two years.

13   Q.    Okay.  And while you were in Los Angeles what did you do

14   for work?

15   A.    I was a mentor.  I worked for the mayor's office with a

16   group called Unity II, and I was doing gang intervention.  So

17   I was the case manager for the Bloods in Los Angeles, in

18   Inglewood.  I would collect the -- the -- the murders and the

19   shootings and see if they were gang-related, and work with

20   the -- the -- the gang team for the -- the -- the police

21   departments there, and I would also help the young people --

22   I would go to the different junior high schools and high

23   schools and talk to them about getting out of the gangs and

24   find ways for them to get jobs and talk to people, job

25   owners, and prepare them to take job interviews and these

1    types of things like that.  I appeared on TV over there for

2    doing that, on NBC.

3    Q.    After you had the two-year stint there in Los Angeles,

4    did you have occasion to move back to the east coast, to New

5    York City?

6    A.    Yes, sir.

7    Q.    Okay.  And did you also have a period, a brief period,

8    there while you resided in a homeless shelter?

9    A.    Yes, sir.

10   Q.    Okay.  Ultimately, did you obtain employment in New York

11   in a concern or a company known as D.F. King?

12   A.    I began to work at D.F. King.  It's a brokerage, a Wall

13   Street firm, and they do proxy.  I worked on the Visa I.P.

14   Q.    Okay.  And how long did you work for D.F. King?

15   A.    Approximately a year and a half.

16   Q.    Okay.  Did there come a point in time when you were in

17   New York when you were contacted by an individual named Tony

18   Osias to come down to Florida?

19   A.    Yes, sir.

20   Q.    Okay.  Let me back up just for a minute.  While you were

21   in New York, did you start a company known as The FIKS?

22   A.    Yes, sir, I did.

23   Q.    Okay.  What is The FIKS?

24   A.    The FIKS stands for Fundamental Islamic Knowledge and

25   Seminary.  It's an online Islamic college and we also show up

1  in person and teach.

2  Q.   Okay.  And what were your duties and responsibilities in

3  New York as it related to The FIKS?

4  A.   I was the teacher.  I taught classes and I ran the

5  summer school for the children.  We took the -- in New York,

6  you have a lot of children that come from war-torn countries

7  and are like -- we call them "mutants."  They're either born

8  here and their parents are over there.

9         So we take them on trips throughout New York City

10  and make them feel good about being Muslim and show them

11  other Muslims who are working within the society to show that

12  they can -- that they fit, too.

13  Q.   Now, as a result of The FIKS and your role there as a

14  teacher, did you begin to have a following throughout the

15  Muslim world?

16  A.   Yes.  We started -- we put online our videos and then

17  people asked for websites.  So we made a website.  Then

18  people started inviting me to give lectures in different

19  countries and we had approximately a following in about 23

20  different countries.

21  Q.   Okay.  And did you actually travel to those countries

22  and give lectures?

23  A.   Yes, sir.  I traveled and got invited to numerous

24  countries and -- and -- and different universities and Muslim

25  societies in those places.  I went there and I gave lectures.

1  Q.    Okay.  Now, again, moving forward, did you -- were you

2  contacted by Mr. Osias about coming to Orlando?

3  A.    Yes, sir.

4  Q.    Okay.  And explain, if you would, the circumstances of

5  that.

6  A.    Mr. Osias called me.  I didn't know him.

7  Q.    First of all, when was this?  Do you recall -- do you

8  remember what year it was?

9  A.    I believe it was 2009.

10  Q.    Okay.

11  A.    I'm not too sure.

12  Q.    Okay.

13  A.    We had an argument.  He didn't know me, but he knew my

14  phone number and he invited me, told me to come down and live

15  in Florida to teach there, to make that my base.

16         And my son Hud was just coming out of surgeries,

17  and so we needed a place to have a better life for him and

18  the children.  So, you know, New York is cramped.

19  Q.    Okay.

20  A.    So we accepted his offer on condition that he could find

21  two homes in proximity.  He did so and we drove down to

22  Florida.

23  Q.    What was the reason for two homes?

24  A.    Well, because of my two wives.

25  Q.    Okay.  And where -- where did you take up residence in

1  Florida, if you recall?

2  A.    In Orlando.  Orlando, Florida.

3  Q.    Do you remember the name of the street?

4  A.    Fort Thomas Way.

5  Q.    Okay.  And this was in approximately 2009?

6  A.    Yes, sir.

7  Q.    Okay.  And did you continue to teach and operate The

8  FIKS?

9  A.    Yes, sir.

10  Q.    Okay.  And was that your primary source of income?

11  A.    Yes, sir.

12  Q.    Okay.  And did it continue to be the primary source of

13  income until you were incarcerated in this case?

14  A.    Yes, sir.

15  Q.    Now, what was your daily schedule once you took up

16  residence here in Orlando as it related to The FIKS and your

17  life in general?

18  A.    When I would get up in the -- when I came to Florida, I

19  found out that the ex-champion or the champion Michael Bell

20  was here.

21  Q.    Okay.

22  A.    So he's world famous in martial arts.  I've been doing

23  martial arts since I was, like, eight years old.  So I wanted

24  the opportunity to train with him.  So I found him and I

25  would get up in the morning time, because he accepted me, and

1    I went there in the morning and I would get there around

2    6:30, 7:00 and I would train with him for about an hour.

3         Then I would go back to my families and I would do

4    whatever we had had to do in the morning time, whatever

5    necessary family things we needed to do.

6         Then by 11:30, 12:00 I would be in my office, which

7    was in Ms. Wills' house, and I would start teaching online.

8    Q.    "Ms. Wills" being one of your wives?

9    A.    Yes, Ms. Wills being my -- my -- my wife.  And I would

10   begin teaching online at that time until approximately 8:30.

11        Then I would go lead the prayer at the mosque, the

12   local Muslim church, and by 10:00 I would be home.  Then the

13   next day I would do the same thing.

14        On the weekends -- Thursday or Friday I would fly

15   out of the country and go to Canada or go to another state

16   and give lectures at least once a month to those places.

17   Q.    Now, with regard to running the business of The FIKS and

18   the financial affairs, who was in charge of that?

19   A.    Ms. Wills was in charge of the financial affairs of the

20   family and even some of the affairs of The FIKS.

21   Q.    Okay.  Did she have a title at The FIKS?

22   A.    She was the C.F.O., the chief financial officer, and

23   that's because she has a master's degree in business

24   administration.

25   Q.    And did you have involvement in the financial affairs of

1    the business?

2    A.    No, sir.

3    Q.    Any involvement?

4    A.    No.   I mean, what I would do is I would sometimes look

5    over the paperwork after it was done and to see if there was

6    some issue that I would ask her about; but, no, I didn't -- I

7    didn't have anything to do with that.

8    Q.    And did you have -- with regard to your family's

9    finances, who was in charge of those?

10   A.    When you mean my family finances, do you mean the paying

11   of the rents and things like that?

12   Q.    Yes.

13   A.    Ms. Wills covered all of those things.

14   Q.    And did you have involvement in the family finances?

15   A.    No, not at all.   There was -- everything was tied to her

16   doing everything.

17   Q.    Okay.   When you got to Orlando, did you establish a

18   relationship with an individual known as Tony Osias?

19   A.    Yes, sir.

20   Q.    And what type -- would you describe for the Court the

21   relationship that you and Mr. Osias had?

22   A.    Tony Osias is the businessman.   He is the one who

23   invited me down here, okay?   He's host.   So anything that I

24   need -- I didn't know anybody in -- actually, I knew one

25   family here in Florida, in Orlando.   Besides that, the only

1    person I knew was Tony Osias.

2              So if I needed anything, I would ask Tony Osias.

3    If I needed a refrigerator, if I needed a computer, Tony

4    Osias would, you know, get all those things for me.

5    Q.    And did Mr. Osias, to your recollection, indicate to you

6    in words or substance that he was a tax return preparer?

7    A.    Eventually.  What happened is I asked him -- I think it

8    was 2009 or 2010 I asked him -- I told him I had to do my

9    taxes, okay?  And I told him I needed a tax preparer.  Does

10   he know a tax preparer here, okay, because everybody

11   networks.  So I'm going to him, "Do you know a tax preparer?"

12   He said he's a tax preparer.

13             I told him specifically, "I don't want to use you."

14   You know, specifically -- this may sound funny.  I said, "I

15   don't like to work with black people," because there's always

16   some type of scam going on sometimes and I want the work done

17   professionally.

18             There was another person called Nazeer Mujahed, who

19   was working with The FIKS at that time, and he offered to do

20   my taxes, and I said, "I don't want to use this guy because I

21   think there's something funny with his activities."

22             So he told me, "Look, I'm a tax preparer."

23   Q.    He told you, Mr. Osias?

24   A.    Mr. Osias said, "I'm a tax preparer.  I got a license,"

25   or, "a number that they give you to register as a registered

1   tax preparer."

2         So I said, "Hey, I respect that."  I respect

3   somebody who's educated.  Myself -- I know I educated myself.

4   This guy says he's a tax preparer.  He says he has a number

5   and has gone through the route.  I said, "Okay.  You know,

6   I'll go with you."

7   Q.   Okay.  Did he prepare your taxes?

8   A.   Yes, sir, he did.  He prepared my taxes.

9   Q.   Did he prepare taxes for other individuals that you

10   knew?

11   A.   He prepared the taxes for everyone in my family, which

12   means both my wives.

13   Q.   Now, were your Islamic marriages recognized as marriages

14   under United States law?

15   A.   This is the issue, you know, because -- because the

16   government does not accept our Islamic marriage, we are

17   forced, each one of us, to file head of household, okay,

18   in -- in -- in the marriage.

19   Q.   Okay.

20   A.   Okay.  So we've been doing that ever since we've been

21   married, because what else -- what other option is there for

22   us to do with the taxes?  If they would allow us to plead

23   married as we say, then I would be the only one filing.

24   Q.   Right.  Okay.  And when Mr. Osias prepared your tax

25   returns, did you rely on him for his expertise?

1    A.    Yes, sir.  What does that mean, though?

2    Q.    Did you -- did you expect that he was going to prepare a

3    proper and legal tax return?

4    A.    Yes.  There was -- yes.  I told him from the beginning I

5    wanted a professional job.

6    Q.    Okay.  And have any of your tax returns or your wives',

7    to your knowledge, been audited?

8    A.    Well, just recently, after this Indictment came down,

9    Ms. Wills has been audited.  However, there's just that one

10   last year.

11   Q.    Okay.

12   A.    Otherwise than that, no.

13   Q.    To your knowledge, have you been prosecuted or any of

14   your wives been prosecuted for filing false tax returns?

15   A.    No.  No, sir.

16   Q.    Your co-defendant in this case is an individual by the

17   name of Jonathan Jimenez.  What is your relationship with Mr.

18   Jimenez?  More specifically, what was your relationship with

19   Mr. Jimenez back in 2009, 2010?

20   A.    I was mentoring him.

21   Q.    Okay.  And how did that come to be?

22   A.    Mr. Jimenez, I've known him since 9/11.

23   Q.    Since 2001?

24   A.    I say 9/11.  I forget the exact year.  I think it's

25   2001.

1    Q.    All right.

2    A.    Since the event on September 11th.

3    Q.    Okay.

4    A.    Okay.  And so he was approximately about 15 years old.

5    At the time he came down to live with me and my family he was

6    about 25, 24, 25 years old.

7    Q.    And what year was it that he came down to live with you

8    and your family, if you recall?

9    A.    I think it was 2010 or 2011.  The November right before

10   2011, I believe.

11   Q.    Okay.  And how did it come to be that he came to live

12   with you and your family?

13   A.    Okay.  As I said, we -- I've known him for a number of

14   years, growing up in Brooklyn.  He's a Brooklyn young man.

15   And what I have been doing with my life is always been trying

16   to give an opportunity to young people to straighten out

17   their lives.  When I got out of the Marine Corps, I didn't

18   feel I had direction and I got in trouble within six months.

19   Q.    Right.

20   A.    So ever since that, I've always been trying to give some

21   direction to young people; and I told him if he ever had --

22   wanted to get out of the street, I would help him, teach him

23   how to do that.

24         I had previously -- I have a friend.  His name is

25   Mustafa.  He's a compatriot, meaning he's my age group, and

1   he also studied in Mauritania.

2   Q.   Along with you?

3   A.   Along with me.

4   Q.   All right.

5   A.   Okay.  He was unable to finish his studies because he

6   got cancer and he had to come back to the United States.

7   Q.   Right.

8   A.   He has a son.  His son's name is Rasheed.  He wanted

9   Rasheed to go over to Mauritania and study, just like we

10  studied, and complete what he didn't complete, which is

11  studying the Koran and these things like that.

12          So when I was living in New York, in the Bronx and

13  in Brooklyn, he sent Rasheed to my house and I would meet

14  Rasheed at the library and I would study with him every day,

15  teaching him how to read Arabic, telling him -- teaching him

16  other things as well, how to be a young man, you know, things

17  about life, you know.

18          Then, when we felt that he was mature enough, I

19  took him with me on a trip to Saudi Arabia to the Kaaba,

20  which is a religious trip; and after that, his father sent

21  him to the school that we went to in Mauritania to learn

22  Koran, and he went over there.

23          Him and Mr. Jimenez are friends.

24  Q.   Rasheed and Mr. Jimenez?

25  A.   Rasheed and Jimenez are friends.  When Rasheed left,

1    Jimenez went to Rasheed's father, Mustafa, and he said to

2    him, "What happened to my man?  Where's he at?"

3             And Mustafa told him, "Look, we got him out of

4    here.  He's overseas."

5             And to us, to a lot of people that live in a city

6    or grow up here in the United States and then become Muslim,

7    going overseas is like a utopia mentality.  "Oh, over there.

8    The everything is going to be" -- not that it is like that,

9    but that's what we believe.  All problems fade away in the

10   mentality.

11            So Jimenez said, "I want to go, too.  You got him

12   out of there.  That's great.  Let me go."

13            So Mustafa said, "Okay.  I'm not going to send you

14   myself.  I'm not going to open a door and let you go over

15   there.  I'm going to call Robertson.  If he -- if you jump

16   through his hoops, if he says it's okay, then I'll send you,

17   okay?  We'll send you, me and Robertson, okay?"

18   Q.   So that's how Mr. Jimenez came to live with you and your

19   family?

20   A.   Well, what happened after that, Mr. Mustafa called me,

21   okay, and when he called me, he told me that the young boy --

22   we called him "Yahyah" or Jimenez -- he wants to go overseas,

23   too.

24            I said, "Hold on.  We can't just send him overseas.

25   The situation is different from Rasheed.  Jimenez doesn't

1    have a father."

2              And to us, that's a big difference, because his

3    father died when he was real young.  We know his mother.  His

4    mother was on drugs, you know, and had different men.  We

5    seen "Yahyah" growing up, always getting in trouble.

6              We said before we send him overseas, send him down

7    to me and I'll see if ma -- if he's really ready to go

8    overseas, okay, because it has happened in the past, when I

9    went to Mauritania, I came back to the United States and I

10   grabbed one of my friends who was addicted to drugs, crack,

11   and I said, "Listen, pack your family up.  Come overseas with

12   me, live there and study."

13             He packed his family up, came overseas.  His name

14   is Abu-da Haman.  While he was over there, he invited one of

15   his friends that I didn't know.  When this man came over,

16   within two weeks he had gotten a girl -- had sex, elicit sex,

17   with a young lady over there and then ran out of the country.

18   The girl wound up pregnant, and the people and the family

19   came and they were angry at me because of this situation.

20             MR. HANDBERG:  Objection.  Move to strike.

21   Relevance.

22             THE COURT:  Mr. Brodersen, I've got the background

23   part.  We're going way astray of what I need to know.

24             MR. BRODERSEN:  Okay.

25   BY MR. BRODERSEN:

1  Q.    So the idea was that Mr. Jimenez would come to live with

2  you in order to prepare him to see whether he's ready to go

3  overseas, to Mauritania?

4  A.    The idea was to see if he was going to -- if he was out

5  of the street, and I wasn't going to put my word to send him

6  overseas if he wasn't prepared to act like a young man.

7  Q.    Okay.  Did he come down to live with you in November of

8  2010?

9  A.    Yes, sir.

10 Q.    Okay.  And did he reside in the garage of one of your

11 homes?

12 A.    He resided in both garages of my homes.  He went --

13 since I have more than one wife, I would go from one home to

14 the other every day.

15 Q.    Okay.

16 A.    And since --

17 Q.    Did you have a home -- did you have an office for your

18 business and your personal affairs in one of the garages of

19 one of the homes?

20 A.    Yes, sir.

21 Q.    Okay.  And did there come a point in time when you and

22 Mr. Jimenez were both in that garage office and the issue or

23 the subject, I should say, of taxes came up?

24 A.    No, sir.  I was in my -- my office in my -- inside of my

25 home.  I have -- in my garage is my study.  Inside the house,

1   there's another room that I had as my actual office, and one

2   day I was in my office and I was preparing myself to go see

3   Tony Osias to do my taxes.

4   Q.   Right.

5   A.   He saw me -- Jimenez saw me doing -- getting my papers

6   ready and he said to me, "What are you doing?"

7         And I told him, "I'm getting ready to go do my

8   taxes.  Haven't you ever done your taxes before?"

9         And he told me, "No."

10  Q.   Okay.  And what did you say to him?

11  A.   I told him, "Well, you know, you're a grown man."  I

12  mean, we were constantly reminding him, "You're a grown man.

13  You have to do your taxes.  As long as" -- I said, "All the

14  adults in this house do their taxes; and as long as you stay

15  here, you're going to do your taxes."

16  Q.   Did you say anything else to him with regard to doing

17  taxes?

18  A.   Yes, sir, I did.

19  Q.   What else?

20  A.   I said, "Did you work?"

21         And he said, "Yes."

22         I said, "What did you do?"

23         He said, "I was hustling."

24         I said, "Well, 'hustling' has a legal term."

25         You know, I thought the term was "street vending,"

1    you know.  If you worked, you gotta do your taxes.

2            I asked him again, "How -- Did you make any money?

3    How much money did you make?"  And he said he didn't know.

4            I said, "Well, listen.  I don't mess with

5    electricity and I don't mess with taxes," you know, and he

6    started laughing.  I said, "No.  I'm serious," you know,

7    because there's an Islamic principle, (speaking Arabic words)

8    meaning knowledge precedes words and deeds, okay?  So you

9    can't do something if you don't know it.

10           So I said, "Look, I go to Tony Osias.  Get your

11   stuff.  You go to him, explain to him everything, and he'll

12   help you figure it out."  And that's what I did and I didn't

13   think about it again.

14   Q.   Okay.  And do you know whether or not he went to Tony

15   Osias to have his return prepared?

16   A.   Yes.

17   Q.   Did he?

18   A.   Yes, he did.

19   Q.   And did there come a point in time when you discovered

20   that he had in fact filed a tax return and received a tax

21   refund?

22   A.   Yes, sir.

23   Q.   And can you recall how you discovered that?

24   A.   Well, like my daily schedule is, I was saying, my weekly

25   schedule, I was constantly leaving the state.  When I leave

1  the state, Jimenez would be -- go to the local Muslim church

2  to stay there for the weekend because he couldn't stay with

3  my family.  So I'm seeing him in passing and stuff.

4          When I saw him one time, he had gotten a mail,

5  saying he had gotten his tax return and everything like that,

6  and as I recall, he gave me what I think is a receipt, saying

7  how he did his taxes or this type of thing like that.  I

8  don't even remember the exact date.  He asked me what he

9  should do with it, and I told him he should save it because

10  he needs those types of things.

11          He said, "What am I gonna to do with it when I go

12  overseas?"

13          I said, "When I went overseas, I gave my stuff to

14  an older person," a person named Wali Abdul-Haqq, "and he

15  held my paperwork for me, okay?  If you want, I'll hold it

16  for you."

17          He said, "Yeah.  Would you?"

18          I took it.  I put it on my inbox.  I have a bunch

19  of papers and things.

20          Some days later I was taking it and making a file

21  for him, because I didn't immediately do that, you know.  So

22  one day later I grabbed that paper and I was putting it in my

23  file cabinet, my file cabinet is behind my desk, I looked at

24  it and I saw that he had my two daughters on there, okay, and

25  my older two.  I said, you know, "Why did he do that?"

```
1              I didn't realize at that time that he had done

2     that.  So I immediately called Tony Osias on the phone and I

3     said --

4              MR. HANDBERG:  Objection; hearsay.

5              THE WITNESS:  No.  This is. . .

6              MR. BRODERSEN:  Your Honor, I would offer that

7     as -- under Federal Rule of Evidence 8033 as demonstrative of

8     his then state of mind.

9              THE COURT:  The objection is overruled.

10    BY MR. BRODERSEN:

11    Q.   You may testify.

12    A.   I called him and I said to him, "Who told you to put my

13    daughters on this man's taxes?"

14             He said to me, "I'm just doing what I was told."

15             I said, "But who authorized you to do that?"  I

16    said, "What type of Muslim do you think I am, going to put my

17    grown daughters on another man's taxes?"  I said, "It don't

18    make no sense."

19             Then he said, "I'm just doing what I was told."

20             So I turned around, because my door is there as

21    well, I turned around and I called my wife.  I said,

22    "Ummhaajar, did you," because she, Ms. Wills, is the other

23    one that I go to doing the business.

24             THE COURT:  Mr. Robertson, slow down.

25             THE WITNESS:  I'm sorry.
```

1        THE COURT:  Take a deep breath.  Slow down a little

2   bit, okay?

3        THE WITNESS:  Yes, sir.

4        THE COURT:  All right.

5   BY MR. BRODERSEN:

6   Q.   So you turned around and through the door --

7   A.   I turned around and I yelled at Ummhaajar -- I mean at

8   Ms. Wills and I said, "Did you tell Abu Luqman," Tony Osias,

9   "to put the children and my daughters on Jimenez's taxes?"

10       She said, "No.  I was wondering why you did that,

11  you know."

12       And I -- I said, "Okay.  You know, whatever, man,

13  you know," and that ended the conversation at that time and

14  at that point I felt -- you know, I felt that it was my

15  fault.  I felt what was my fault, though, was that I didn't

16  pay more attention and be on top of this thing to keep these

17  guys from going and doing stuff like that.

18       I didn't think it was illegal, though, because, I

19  mean, he knows what he's doing.  I just think that these guys

20  do all types of shady stuff sometimes, and I always was

21  telling him that "You business guys are always doing some

22  type of shady stuff," like the McDonald's and Disney claiming

23  to be, you know, minorities when they do their taxes or

24  Romney and those.  So I figured these guys are doing that

25  type of stuff.

1   Q.    Okay.  Now, after this, did there come a point in time

2   when you drove Mr. Jimenez to the bank?

3   A.    No.  What happened before that, because I don't -- I

4   don't really mess with money, okay?  Period.

5   Q.    Right.  Did you learn that Mr. Jimenez had received a

6   check from the government?

7   A.    He had already received the check, as far as I remember,

8   when he gave me that paper.

9   Q.    Okay.

10  A.    What I told Mr. Tony Osias, I said, "Go with this guy

11  and help him, you know, negotiate the check."  I said, "Take

12  him to a check-cashing place," because I knew he didn't have

13  a bank account, "and teach the guy how to cash a check."

14         I was at the Muslim church and they came up to me,

15  Tony Osias and Jimenez, and they said, "We did -- we opened

16  up a bank account."

17         I said, "What do you mean you opened up a bank

18  account?  I thought I told you to take the guy to open up the

19  check."

20         He told me, "You don't know what you're talking

21  about."

22         I said, "Okay.  Then break it down," which means I

23  don't know what I'm saying.  So, okay, explain to me what

24  you're doing here, basically is what I'm saying.

25         So he said to me that if I would have taken him to

1    the check-cashing place, they would charge a percentage of

2    the money to cash the check and it would cost over $100 to

3    get this check cashed.

4           If I take him to a bank, then the bank -- he can

5    deposit it in the bank and then after a couple of days, he

6    gets all of his money.

7           I said, "Well, you know, I didn't know that."

8           He said, "Yeah.  You stick to your thing, I stick

9    to mine."

10          I said, "You know, my mother always said it takes a

11   whole village to raise one child.  You do your thing.  I'll

12   do mine."  And I left it alone at that because, again, you

13   know -- I even said to him, "You see, you do whatever you

14   guys want.  I say something, you know, and you guys do

15   whatever you want, you know."

16          But I said, "Okay.  You're responsible.  You got

17   that," because he is a businessman.  I don't know that stuff

18   and I didn't know they charged money like that.

19   Q.   Did you come to learn that there was in fact a bank

20   account that had been opened?

21   A.   Right.  That's how I found out that there was a bank

22   account.

23   Q.   And did you have occasion one time to go to the bank

24   with Mr. Jimenez and Ms. Wills?

25   A.   What happened was that Mr. Jimenez came to me and said

1    he wanted to get the money, okay, or something like that.

2              Then I said, "Listen, what you should do, since

3    you're going overseas, you should get -- ask one of my wives

4    to get on the account with you, okay, so they can send you

5    money when you need the money, all right?"

6              I said, "I don't know which one you're going to

7    choose."  And I assumed he was going to choose Ms. Elhadi

8    because she's from Brooklyn.  She's more like an aunt to him,

9    in the relationship I saw them forming, okay?  But he asked

10   Ms. Wills.  He asked her.

11             So she's not going to go to the -- drive in the car

12   with him alone anywhere, okay?  So that's how I came about to

13   drive with them to the bank.

14   Q.   Did you take part at all in the transaction that

15   occurred at the bank?

16   A.   No, sir, I did not.  I went into the bank.  I was

17   watching my child.  I had my baby with me, okay?  And I went

18   into the bank because we weren't going to sit in the car in

19   the hot sun, okay?  And I sat off -- the bank was set up

20   where there's a waiting area off to the left and then there's

21   the transaction desk up front and then there's some desk or

22   counter, I should say, and there's some desks to the side

23   here where they talk to you in private.

24             I came in after them, because the two of them went

25   inside the bank first, and then after I sat there for a

1   moment, I said, "I don't want to sit in the car right here in

2   the sun."  Then I took my child, and it took me time to get

3   her out of the car seat, and I took her and me and her went

4   into the bank after them and we sat off to the left.

5           Now, I saw what they were doing.  I didn't hear

6   exactly what they were doing or anything like that; and when

7   they were ready to leave, we left.

8   Q.    Okay.

9   A.    When we got in the car, the extent I did was I said,

10   "Hey" -- I used to call him "Big Dummy" sometimes -- "did you

11   count your money and did you get a receipt?"

12           He said, "No."

13           I said, "You need to go back in there and get a

14   receipt and count your money at the counter, okay?"

15           That was it.

16   Q.    Did you know -- at that time did you know that Ms. Wills

17   had become a signatory on Mr. Jimenez's bank account?

18   A.    Yes.  I did know that, yes, sir.

19   Q.    And were you ever a signatory on that bank account?

20   A.    No, sir.

21   Q.    Did there -- did there come a point in time when you

22   borrowed money from Mr. Jimenez, from the proceeds that he

23   had received as a result of the tax refund?

24   A.    Yes.  What happened was I was used to -- accustomed to

25   leaving every month to go travel.  When I travel, the -- the

1    Homeland Security -- I cannot travel unless Homeland Security

2    gives me permission to travel.

3    Q.    Without getting into the details of that, did you -- did

4    you take a trip to Canada and expect to receive an honorarium

5    for your lecture in Canada, but you were unable to get there?

6    A.    I mean, that doesn't tell you the true story.  Can I

7    tell you what happened?

8    Q.    Well, I understand that you were denied -- you were

9    denied entry into Canada, correct?

10   A.    Yes, sir.

11   Q.    Okay.  And so you had to come back home and you didn't

12   receive the honorarium?

13   A.    Right.

14   Q.    And as a result of that --

15   A.    And it was time for us to pay our -- our rent.

16   Q.    As a result of that, your money was tight?

17   A.    Right.

18   Q.    Did you borrow some money from Mr. Jimenez?

19   A.    Yes, sir.

20   Q.    As a result -- or when you borrowed the money, to your

21   knowledge, did Ms. Wills or yourself place an I.O.U. in his

22   papers?

23   A.    What happened is I told Ms. Wills to pay our rent.  As

24   is normal, she pays the rent; and she said that we didn't

25   have enough money, but if we took maybe $400, I think it was,

1       out of Jimenez's money, we can cover it and then pay it back.

2               I said, "Well, do what you have to do.  Manage the

3       money, and just make sure you put an I.O.U. on there so you

4       know how much money you took from that and you can put it

5       back when we -- when the month turns and we get our students

6       to pay their bills, okay?"

7               So I assumed that she did that.  I never saw the

8       I.O.U.s.  I never saw her do it, but she's good like that.

9       Q.   Other than that $400 that you borrowed and placed the

10      I.O.U. in there, did you share in any of those proceeds that

11      Mr. Jimenez had gotten as the tax refund?

12      A.   No, sir.

13      Q.   Now, I want to ask you about a couple of statements that

14      you made in conversation that the government taped.

15              MR. BRODERSEN:  Your Honor, may I approach and get

16      the transcript that was entered as Defense 1?

17              THE COURT:  Yes.  You don't have your own copy?

18              MR. BRODERSEN:  No.  I want to show it to the

19      witness.

20              THE COURT:  Okay.  You now have my copy.

21              MR. BRODERSEN:  Judge, I can give you my copy.  I

22      just wanted to have the witness get the right one.

23              THE COURT:  Okay.

24              MR. BRODERSEN:  I'm looking for the right place,

25      Your Honor.

```
 1              THE COURT:  Page 16.

 2              MR. BRODERSEN:  Sixteen is where it begins, but I

 3   want to direct his attention to a particular statement that

 4   he made.

 5              THE WITNESS:  I would like to explain the whole

 6   thing to give the context of the conversation.

 7   BY MR. BRODERSEN:

 8   Q.   Well, the Court has the whole transcript.  I want to

 9   direct you to page 16 of the transcript.

10              THE COURT:  You can have your copy back, if you

11   need it.

12              MR. BRODERSEN:  Thank you, Your Honor.

13   BY MR. BRODERSEN:

14   Q.   Mr. Robertson, actually, if you turn to page 17 -- this

15   is a transcript of a telephone conversation between you and

16   Mustafa, correct?

17   A.   Yes, sir.

18   Q.   Mustafa Al-Hanafi was the individual that you were

19   talking about before whose son Rasheed had gone to Mauritania

20   and who had, in essence, sent Mr. Jimenez down to Orlando to

21   live with you?

22   A.   Yes, sir.

23   Q.   Okay.  And in this telephone conversation, at page 17,

24   about the middle of the page, do you see the entry where you

25   said that "I made him do taxes and I put three of my children
```

1    on his name, okay"?

2    A.    Yes, sir.

3    Q.    Did this conversation occur after you had discovered

4    that your children were utilized on Mr. Jimenez's tax return?

5    A.    Yes, sir.  This part, this is -- this part of the

6    conversation or the whole thing, but this part in particular

7    happened after I had that conversation with Tony Osias on the

8    phone and after I had realized what had happened and after I

9    accepted it as a reality, okay?  But it doesn't end there.

10   Q.    Right.  What do you go on to say?

11   A.    Okay.  It says here, if we do the sentence here, like,

12   "I was -- I haven't been looking at the account, but she

13   keeps the money."  But this -- that's half a statement.

14          The other statement starts on page 16 that says,

15   "My wife said that he's down -- he's down almost to $1,000."

16   Q.    Right.

17   A.    Mustafa says, "Come on."

18          I say, "Okay."

19          He says, "Man, in one day?"

20          I said, "Now, no.  No, not in one day.  Like, I

21   haven't been looking at the account, but she keeps the

22   money," referring to Ms. Wills.

23   Q.    Correct.

24   A.    "You know what I'm saying?  So what I'm -- what do you

25   call it?  She said, oh, since he's been here, his -- his

money has gone, because what happened is this.  I helped him

get some money.  I made him do taxes and I put three of my

children on his name, okay?"

Now, this is, again, after I had known about this.

Then he says, "Right.

"So they -- but I told him, I said, 'I'm not doing

that for you so that you can use that money -- I'm doing that

for you so that you can use that money to go overseas.'"

This is important as well, because I say that to

him after I found out that they had used my children on a

name.  I told him, "I'm going to make you amend your taxes,

okay?"  Because there was another guy that used my children

on their taxes a few years earlier and I made him amend his

taxes, okay, without my knowledge, and that was Wali

Abdul-Haqq, the same guy that I let him hold my paperwork

when I went overseas, okay?

So I told him I knew he could do that, but I said

I'm not because it's already a done deal, and the guy had --

Mr. Tony Osias had did it.  So I figured it was okay.  So I

said, "I'm not going to force the issue because it's already

done, but I'm only letting you do that because you're going

overseas to study.  I'm not going to let you go anywhere with

that money, okay, if you don't."

Then he says, "Because, you know, usually dudes

charge for that type of work, you know."

1              Then he says --

2              THE COURT:  You're just -- you're reading to me.

3              THE WITNESS:  Yes, sir.

4              THE COURT:  I can read.

5              THE WITNESS:  I wanted to explain it, Your Honor.

6    I didn't know if -- because there's --

7              THE COURT:  But you're not explaining it; you're

8    just reading something I can read.

9              THE WITNESS:  Okay.  Well, I'll explain it.  I'm

10   sorry.

11             THE COURT:  Two things:  You need to slow down,

12   because poor Diane here is trying to take down everything you

13   say --

14             THE WITNESS:  I'm sorry, Your Honor.

15             THE COURT:  -- and, secondly, answer his questions.

16             THE WITNESS:  I'm sorry.  I didn't think -- I

17   didn't hear the question.

18             THE COURT:  I mean, that's the problem.  You're not

19   answering the question.  You're just giving a narrative and

20   we're kind of getting off track and you're just reading to

21   me.  Try to condense it down to answer his questions, okay?

22             THE WITNESS:  All right.

23   BY MR. BRODERSEN:

24   Q.   Mr. Robertson, what I was attempting to establish is

25   that the conversation that is reflected in this transcript

1   occurred on June 17th of 2011, and this was after you had

2   learned that Mr. Jimenez had utilized three of your children

3   on his tax return?

4   A.   Yes, sir.

5   Q.   And after he had opened up the bank account at Wachovia

6   Bank?

7   A.   Yes, sir.

8   Q.   Okay.  That's all I have for this issue.

9         THE COURT:  Okay.

10        MR. BRODERSEN:  I need to return that to the Court.

11  BY MR. BRODERSEN:

12  Q.   Now, Mr. Robertson, I also want to ask you about a very

13  brief conversation that you had with Mr. Osias on August 23rd

14  of 2011.  That, incidentally, was the day that the search

15  warrant was executed on your home and the day that you were

16  arrested.  But prior to your arrest, do you recall seeing Mr.

17  Osias?

18  A.   Yes, sir.

19  Q.   Okay.  What were the circumstances of your seeing him

20  that day?

21  A.   Mr. Osias -- I was in -- in the morning time, like I

22  said, I go to Mr. Bell's class.  So at that morning I was at

23  Mr. Bell's class.  Tony Osias came to the class and was

24  driving me to my house.

25  Q.   Okay.

1   A.   And as we were driving, he already knew that my house

2   had been raided.

3   Q.   Okay.

4   A.   I didn't know what reason my house had been raided.   So

5   we were discussing what were the possible reasons why the

6   F.B.I. would raid my house.

7   Q.   Okay.

8   A.   In the course of that conversation, he mentioned to me

9   about the taxes.   So I asked him --

10  Q.   Okay.  I want to quote from the stipulation.  It says,

11  "Robertson:  Think then that's a tax fraud thing?  That's

12  what it is?"

13  A.   Right.   I asked him --

14  Q.   The preparer, Mr. Osias, responds:   "You got it."

15  A.   Right.

16  Q.   So what -- how did that come up?

17  A.   Okay.  He's throwing ideas at me and I'm throwing back

18  ideas, what could be the issue.  So when he mentions to me

19  the taxes, I'm, like, "Why would that be -- why would they

20  come after me for taxes?"

21          And he mentions tax fraud and he mentions Jimenez.

22          So that's when the conversation leads, "Do you

23  think that they think there's tax fraud then?  You know, is

24  that what it is?"  It a question because I don't know.

25          And he says, "You got that right."

```
 1   Q.    Now, you didn't know that you were being -- that this

 2   portion of this conversation was being taped?

 3   A.    No, sir, I did not.

 4   Q.    Did you ever direct or instruct Mr. Jimenez to put your

 5   children on his tax return?

 6   A.    No, sir, I did not.

 7   Q.    Did you ever direct or instruct Mr. Osias to put your

 8   children on Mr. Jimenez's tax return?

 9   A.    No, I did not.

10   Q.    Prior to the tax return being filed, did you know that

11   your children had been put on his tax return?

12   A.    No, I did not.  They did not come and talk to me about

13   it.

14             MR. BRODERSEN:  The Court's indulgence for one

15   moment?

16             THE COURT:  Okay.

17             MR. BRODERSEN:  I have no further questions.  No

18   further questions, Your Honor.

19             THE COURT:  All right.  Thank you.

20             Mr. Handberg.

21             MR. HANDBERG:  Thank you, Your Honor.

22                      CROSS-EXAMINATION

23   BY MR. HANDBERG:

24   Q.    Good morning, Mr. Robertson.

25   A.    Good morning.
```

1    Q.    Now, you've filed personal tax returns before, haven't

2    you?

3    A.    Yes, sir.

4    Q.    And you've filed them for many different years, correct?

5    A.    I filed them through a tax preparer, yes.

6    Q.    And on those tax returns that you personally filed, you

7    had to sign them under penalty of perjury, correct?

8    A.    Sir, yes, sir.

9    Q.    You know from your prior federal prosecution what

10   perjury is, right?

11   A.    Sir, yes, sir.

12   Q.    I'm sorry.  What are you saying?

13   A.    Sir, yes, sir.

14   Q.    Okay.  I'm sorry.

15         THE COURT:  That's the old Marine Corps coming out

16   in him.

17         MR. HANDBERG:  Yeah, I think so.

18   BY MR. HANDBERG:

19   Q.    Which means that the information that's contained on

20   federal tax returns needs to be true and correct, right?

21   A.    Yes, sir.

22   Q.    And Jonathan Jimenez is not related to you in any way,

23   is he?

24   A.    I have a question before I can answer that.

25   Q.    You have a question.  You said you've only known him

1   since he was 15, right?

2   A.   Well, sir, as you said, in my prior testimony in federal

3   court, one of the things that I testified about was what

4   constitutes "family" and what the court might constitute as

5   "household."

6            So if you're saying, you know, what the

7   relationship is, he was -- we were sharing the same

8   household.

9   Q.   But he's not your son?

10  A.   He's -- no, he's not my physical son.

11  Q.   He's not your nephew?

12  A.   No, sir.

13  Q.   He's not related in any way --

14  A.   He's related, but not in any physical way.

15  Q.   Okay.  And he came to live with you in November of 2010,

16  correct?

17  A.   Yes, sir.

18  Q.   And when he came to live with you, he would stay where

19  you were staying for the night; is that fair to say?

20  A.   Yes, sir, that is fair to say.

21  Q.   Because you would alternate between your wives?  You

22  would stay at one wife for a night and then go to the next

23  wife, and Mr. Jimenez would go with you and sleep in the

24  garage?

25  A.   Yes, sir.

1  Q.   All right.  And what your testimony is is that the

2  purpose of his trip was you were trying to assist him?

3  A.   Not just openly assist him.  There's -- assisting him in

4  certain things.

5  Q.   But he wasn't coming down here for a job?

6  A.   Yes, sir.  Of course, he was coming down here for a job.

7  Q.   Where was he working?

8  A.   He was working for Tony Osias.  He worked for Mr.

9  Edwards, Munyo Edwards.  He worked a couple of jobs.  He did

10  a lot of odd jobs while he was there.

11  Q.   All right.  Did you ever charge him rent?

12  A.   Yes, I did.

13  Q.   How much did you charge him?

14  A.   First, I told him, "Pay what you like."  Then afterwards

15  I told him to go shopping and bring food.  Then other times I

16  told him to pay Mr. Bell's account for the whole family for

17  the weekly affair.  Then I told him to give, like, $25.  I

18  constantly made him -- tried to make him understand how to be

19  an adult.

20         I didn't charge him big prices like adults would

21  pay, but I did charge him and I made sure that he worked by

22  asking other people to give him jobs.  I pushed him in the

23  direction to help straighten out his life.

24  Q.   All right.  And for the time he was with you for

25  November and December of 2010, how much would you say that

1   Mr. Jimenez paid you?

2   A.   I don't know, because I made him give the money to

3   either Ms. Wills or to Ms. Elhadi.  I know one time -- I know

4   one time I saw him giving them both $100 apiece.

5   Q.   Was this in 2010 or at some other time?

6   A.   Well, 2010, no.  I can't recall in 2010 at all, you

7   know.  That's November, December, that time frame.  But I

8   know during the course he was there and a lot -- not a lot,

9   but every so often he would bring groceries to the house and

10  give to different houses.  So he did those types of things.

11  Q.   All right.  Did he ever do that in 2010?

12  A.   I don't know, sir, to be honest.

13  Q.   All right.  Now, Mr. Osias, you say, prepared tax

14  returns for you and your family for the 2010 tax return year.

15  Did he ever prepare them for any other years?

16  A.   I'm confused on which year that represents.  Does that

17  represent the one -- the last one that I did, that I got in

18  2011?

19  Q.   You had filed in 2011 your 2010 tax return.

20  A.   Okay.  Yes, he did my 2010 and he did my -- the one to

21  the previous year.  Ever since I've been in Florida, he did

22  my taxes twice, sir.

23  Q.   All right.  So he did the 2009 and 2010 years?

24  A.   I would -- yes, sir.

25  Q.   Okay.  I'm not trying to trip you up.  I'm just trying

1   to understand it's more than one year.

2   A.   Okay.

3   Q.   All right.  I understand.  And you say that you found

4   that there was something shady about Mr. Osias?

5   A.   No, I didn't -- I didn't mean it in that fashion.  Let

6   me -- let me withdraw that context.

7        What I said was businessmen in general or when

8   they're doing their business, I always tend to think that

9   they do some things that are shady, like, raise up the

10  prices, and then call it a sale when they lower it, that type

11  of stuff.

12  Q.   All right.  And you were concerned because you don't

13  want anyone who's shady doing anything with your taxes,

14  correct?

15  A.   Well, yes, because I didn't -- I didn't want the guy to

16  steal my information or do something else.  I don't need that

17  type of drama.

18  Q.   All right.  And it's -- did you ever show Mr. Jimenez

19  how to do taxes?

20  A.   I -- no, not -- I didn't show him.  He saw me gathering

21  my paperwork for taxes and I told him, "Look, you go" --

22  because I don't know how to do the taxes exactly.  I know the

23  easy form, to a certain degree.

24       And I told him, "Look, I don't know how to do your

25  situation.  You go to Mr." -- I said, "Abu Luqman," which is

1    Tony Osias, "and you explain everything to him and he'll help

2    you figure it out," because he didn't know -- he didn't have

3    a place where he worked and he didn't know how much money he

4    made.

5            I said, "Look, I can't -- I can't help you do these

6    things, but you go to the same person I go to."

7    Q.    All right.  So you didn't show him how to do taxes?  You

8    referred him to Mr. Osias to be that person?

9    A.    Right.  To do the taxes, yes, sir.

10   Q.    All right.  And you would agree with me that it would be

11   wrong for Mr. Jimenez to claim any of your children on his

12   tax return, correct?

13   A.    No, I do not agree with you with that, sir.

14   Q.    So that wasn't -- so when you said that you found out

15   about that and you thought that was shady, what did you mean?

16   A.    It's two different things, okay?  You asked me one

17   question, if I understand correctly, if I felt that it would

18   have been incorrect for him to claim one of my children on

19   his taxes.  No, I do not think that would have been illegal

20   or incorrect because, according to the tax thing, it says,

21   "household," and he is the head of the household as an

22   individual.

23           He didn't claim them as his offspring, that -- he

24   used a generic term, "child."  There's a term there that says

25   son, daughter, stepson, granddaughter, and another one that

1  says, "child."

2          I don't know what he should have written.  It

3  wasn't for me to figure that out.  He can go to Tony Osias or

4  whoever's the tax preparer to do those things.

5          What I felt was shady was the fact that he did it

6  without talking to me, without coming to me and discussing

7  this whole thing, and then to use my older children on that.

8  I would have never done that, okay?  So that what I felt was

9  shady.

10  Q.    All right.  So you didn't make him do his taxes?

11  A.    Making him do his taxes and making him do his taxes

12  incorrectly or fraudulently are two different things, sir.

13  Q.    All right.  So you didn't have him put three of your

14  children on his tax return?

15  A.    No, not -- no, I did not, sir.  I did not make him do

16  that.

17  Q.    All right.  So when you're recorded saying that on June

18  17th, you clearly said that, right?

19  A.    No, I did not clear say that, sir.  If you have read the

20  transcript, if you go to page 18 on that transcript, it says,

21  "that's why I let him do that."

22          The first thing it says, "I made him do his taxes,"

23  and I put three of my children on them.  This is after I have

24  already argued with Tony Osias and said, "You know, what you

25  guys have done, okay?"

 1              And then I've accepted that my fault in the matter

 2      is that I didn't stand on top of this.  You know, you're

 3      talking about the Marine.  The Marine says you're supposed to

 4      start off as a prick and then you get nicer and nicer as you

 5      go.  I didn't do that.  I gave him too much room, because as

 6      a -- as a -- as a priest, a Muslim priest, you know, we're in

 7      the business of faith, and that -- that -- that motivates

 8      people to do things.

 9              So I was trusting him to go do the right thing and

10      go explain the stuff to him.  I always tell him, "Attention

11      to what?  Details."

12              So when I sent him to go do the taxes over there, I

13      didn't follow up and make sure they did it correctly.  That's

14      what I felt was my fault and that's what I accepted the whole

15      tax thing, but I accepted it because I thought it was still,

16      even though principally wrong, correct legally, okay?

17              So I said, okay.  This has happened.  It's done.  I

18      don't agree with it, but it must be legal because Tony Osias

19      wouldn't have done it if it wasn't legal, in my estimation,

20      okay, because that's his job, and they don't always do what I

21      tell him to do.

22              If it's wrong -- it's the same thing when I told

23      him to go to the bank -- I mean, not to go to the bank -- to

24      go to check cashing.  He goes to the bank.  Why?  Because I

25      don't know what I'm talking about.

1          So if I tell you to go do your taxes and I don't

2     know what I'm talking about and you're the expert, if it's

3     wrong, he's the one to correct you how to do that.

4     Q.    Well, if you didn't think it was wrong, why did you

5     testify previously that you had someone else who had done the

6     same thing amend their tax return?

7     A.    Oh, because he did it without my permission.  What I

8     said was wrong was for them to go do it without my

9     permission, and the second thing was this person was not

10    living in part of my household.  This person was living all

11    the way in Missouri and he thought I was still overseas.

12         So when I came back and we were living in a

13    shelter, he took -- he had my information because I entrusted

14    him with it, and then he put my children on his taxes and I

15    didn't know about that.

16         So when I found out about it, I spoke to him on the

17    phone.  I called him on the phone I said, "You have to amend

18    your taxes.  You know, that's -- that's -- that's illegal for

19    you to" -- and that's the same reason in the same transcript,

20    on page 18, I say, "Hey, Ra had asked me the same thing."  It

21    says that in there.  Ra asked me to do it.

22         I said, no, I won't do that, because these people

23    are not living in the same household, from what I understood,

24    but I did not rely on my understanding.  What I understood

25    was if you're in the same household, maybe you can do that;

1    but I'm not the one to figure it out.

2            Go to the expert.  He's the one that does it.  And

3    I told him, "You explain everything to this guy, and then

4    he'll help you figure it out, not me."

5    Q.    So one of the differences in that situation was that

6    person didn't have your permission, correct?

7    A.    Which situation, sir?

8    Q.    In the situation where you had the individual amend

9    their tax return, they didn't have your permission?

10   A.    Yes, sir.

11   Q.    And so Jimenez did have your permission?

12   A.    No.  He had my permission after the fact.  Jimenez

13   didn't ask me and Tony Osias didn't ask me.

14           What the difference -- the other difference in that

15   situation is that person who I asked to amend his taxes, he

16   was not part of my household.  I felt what he did was not

17   only morally wrong, but illegal as well, okay, because how

18   can you claim the child and you're not providing for that

19   child, okay?

20           This guy wasn't doing anything for the children.

21   He wasn't that type of a situation.  He just did something

22   slick.  That type of slick stuff, I ain't got time for that,

23   and he's a friend of mine, but I told him, "I'm not standing

24   for that."  He amended his taxes, and that was -- I think it

25   was 2008 or 2007, okay?

1          Now, this situation I don't know what was supposed

2   to be correct and I told him that.  That's why I sent him to

3   Tony Osias, so they could figure out what was supposed to or

4   how -- what could happen.

5          If there was something that they needed my

6   permission, then what I expected them to do is to come back

7   to me and talk to me about that.

8          I didn't know what they did with the taxes.  I

9   didn't even know if he did the taxes or not, because half the

10  stuff I tell them to do, they don't do anyway.

11  Q.   All right.  So when you're talking to Mr. Mustafa on

12  June 17, 2011, you don't tell him, "I just learned that they

13  did this."  What you say is, "I put three of my children on

14  his name, okay?"  Correct?

15  A.   Yes, sir.  That's correct.  I -- I -- I summarized and

16  just was giving him bullet points.  But on the next page in

17  the same conversation, I said I only let him do that.  "Let

18  him," meaning I didn't make him do that.  I only let him.

19         Then, in the furtherance of that conversation, it

20  says there, "I don't make anybody do anything."  It says in

21  that thing I didn't make him do anything.  I gave him a

22  suggestion.  He does what he can do.  The same conversation.

23  Q.   Well, the conversation on the next page is you're not

24  going to let him waste the money; isn't that correct?

25  A.   Yes, sir.

1  Q.    Because you gave him that money for a specific purpose,

2  right?

3  A.    No.  I'm not going to let him waste the money.  I'll

4  give you an example where I'm coming from with that, if you'd

5  like.  My father -- when I turned 18, I inherited some money.

6  So my father wouldn't let me waste that money, okay?  He

7  made -- he held it and made me -- and dish it out to me so

8  that I wouldn't waste it.

9        That's the context that I'm talking about with this

10 man.  I'm not going to take his money.  That's why we gave

11 the I.O.U.  It's his money, but to let him take the money and

12 smoke it all up into drugs and everything, no, I'm not going

13 to let him do that.  We would just hold it until he gets his

14 head straight and then give him his money.  That's what's the

15 context of that, sir.

16 Q.    Well, because what you told him was, "You're doing that

17 so that he can have that money to use overseas."  That was

18 the specific purpose of getting that --

19 A.    Right.  The reason why I'm helping him in general is to

20 help him straighten out his life.  That's the general thing.

21 And in part and parcel of that, in our understanding, is to

22 get out of the environment that he is doing all these foul

23 things in and get to an environment where he can get himself

24 straight.

25        The same thing like when they take a drug addict

1    and they put them in -- in -- in rehab or something, but

2    his -- our rehab is overseas, in an environment where,

3    hopefully, he won't be able to do the same thing.

4    Q.    And if he doesn't use the money for the purpose you

5    thought it should have been used for, you weren't going to

6    let him have it, right?

7    A.    You're -- you're -- you're taking that out of context.

8    No, I was not going to let him have it as long as he's being

9    a drug addict.  I was not going to be an enabler for him and

10   enable him to take that money and smoke it up.

11   Q.    You've -- you've reviewed the trial exhibits in this

12   case; is that correct?

13   A.    Sir, yes, sir.

14   Q.    And the transcript of your conversations, those are true

15   and accurate transcripts of who's talking and what was said;

16   would you agree with me on that?

17   A.    It depends.  What -- what -- what context are you

18   referring to, sir?

19   Q.    For instance, the one you were reading from earlier,

20   Defense Exhibit 1.

21   A.    Is that the one we're just talking about right now?

22   Q.    Yes.

23   A.    Yes.  Pretty much, yes, sir.

24   Q.    And the same with the August 23rd -- I'm sorry -- the

25   August conversation that you and your lawyer talked about,

1    your conversation with Mr. Osias about the tax fraud, that's

2    true and accurate, right?

3    A.    Yes, sir.

4    Q.    All right.  And this -- in addition to the other

5    individual you talked about with the amended return, there

6    was another person who's claimed your children on their tax

7    returns that you've let them use, right?

8    A.    I -- besides Mr. Wali Abdul-Haqq?

9    Q.    Yes.

10   A.    There was another lady that I made amend her taxes, too.

11   She was my landlady, who --

12   Q.    Diana Bruce?

13   A.    Huh?

14   Q.    Diana Bruce?

15   A.    I don't remember her name, but she was in the Bronx and

16   she was my landlady.  We rented a room from her, and she took

17   my children's information, because we were homeless at that

18   time and she had access to my paperwork.  And I told her,

19   too, to amend the taxes and I told her that I wouldn't pay

20   her rent until she amended her taxes, and she eventually

21   amended her taxes.

22   Q.    Because it was wrong for her to use your children on her

23   tax return?

24   A.    What it was is that situation there, you have to

25   understand, sir, we are coming from -- I'm coming to the

1   United States after not being here for a number of years,

2   okay?  We're homeless.  People try to take advantage of you

3   when you're homeless.  We rented this room here.  We had all

4   our possessions in this room.  This is this lady's house.

5   She took my stuff and tried to use it to do her taxes, you

6   know?

7            I had to get my stuff back, you know, and tell her,

8   "Look, you can't do this, you know."

9   Q.   What she did was wrong?

10  A.   That's the way they do you when you're homeless.

11  Q.   Would you agree with me that what she did was wrong?

12  A.   I don't know if I should agree with you; but to be

13  honest with you, yes.  To be honest, yes, I think what she

14  did was wrong.  Again, she took advantage of some people.

15  Q.   All right.  Now, at the time that the tax returns are

16  being done in 2011, how many children do you have?

17  A.   Fifteen children but I think 16 are living with me.

18  Q.   Okay.  And you've testified before that because you're

19  not legally married in the United States, you're married

20  under Islam, you and your two co-wives have to file separate

21  returns; did I get that right?

22  A.   Yes, sir, we have to file head of household.

23  Q.   All right.  And so each of you files a head-of-household

24  return where you claim three of the children on the return,

25  correct?

1   A.    No.  Me and my wife -- I'm sorry.  Elhadi, okay, we

2   claimed three; and Ms. Wills, she claimed two; and then I

3   claimed three.

4   Q.    All right.  And Ms. Wills' returns where she claimed the

5   two, is that the one that's being audited by the I.R.S.?

6   A.    I do not know which one is being audited by the I.R.S.,

7   sir, to be exact.

8   Q.    All right.  And so did you ever give Jonathan Jimenez

9   the dates of birth and Social Security numbers of your

10  children?

11  A.    No, sir, I did not.

12  Q.    Did you ever tell Jonathan Jimenez which children you

13  were going to claim on your returns and which ones your wives

14  were going to claim?

15  A.    All my information -- I didn't each give it to Tony

16  Osias, okay?  Tony Osias already had all my information for

17  my children, everything.  He has all that information, okay?

18          So I don't know how Mr. Jimenez got the

19  information.  Maybe he took it off my desk, okay, when I was

20  there or maybe Tony Osias gave it to him from what they did

21  when he did the taxes, but I did not give it to Tony Osias

22  that year and I did not give it to Jonathan Jimenez.

23  Q.    But somehow Jonathan Jimenez -- even though you didn't

24  give the information to Jimenez and you didn't give the

25  information to Osias for that year, somehow Jonathan Jimenez

is able to pick the three children who were not otherwise

claimed on your return or the returns of your two co-wives?

A.    Well, it's simple to me what happened.  Him and Tony

Osias did the taxes.  Tony Osias did my taxes.  He did my

wives' taxes.  He did Jimenez's taxes.  He knows which

children are on there.  I don't know, you know, how it's

going to go, because there's another wife that I have in

Missouri and she has a child -- two children as well and

sometimes that child is over at my house.

        So I claim my son Nuh with me and sometimes she

claims my other daughter, Hind, over there, even though --

and sometimes she claims both of them.  So, you know, that is

something that we work out at the time.

        With Tony Osias, that's our right-hand man, like,

our accountant and businessman.  He has all the information

for my family, because when he went to do the houses, he

rented houses with me with all of our information.  He

already had all of that stuff.

        I wasn't here when they rented the house in my name

and in my wives' name.  In fact, my wives were living in

houses that their names were in the other house, because he

put them in particular houses and we chose other -- the

opposite houses.

        For example, the house that I was living in with

Ms. Wills, the one on the lease was Ms. Elhadi; and the one

 1   on Ms. Elhadi, the one on the lease was Ms. Wills, because

 2   when Tony Osias set it up, he put particular wives in

 3   different houses.  So those things like that happened because

 4   he does those things.  It's nothing to do with me telling him

 5   to do that.

 6   Q.    And so Mr. Jimenez is able to pick three children who

 7   are not otherwise accounted for on someone else's return?

 8   A.    I -- I don't think Mr. Jimenez picked -- I'm not trying

 9   to disrespect Mr. Jimenez, but I don't think he's that bright

10   with that.  I think Mr. Jimenez, if I can say that, just

11   doesn't think about what he's doing, and I think that maybe

12   he misrepresented what he was supposed to be doing to Tony

13   Osias, is what I think that he did.  Now, that's what I

14   think.  And I think that Mr. Tony Osias went too far without

15   checking with me.  So that's what I believe happened in this

16   whole thing.

17   Q.    Now, that's not what Mr. Osias has told you in your

18   post-arrest correspondence exchanges, is it?

19   A.    Mr. Osias, after the fact, I mean -- I don't know what

20   you mean exactly.

21   Q.    Well, he's written you letters where he said that he did

22   what you asked him to do; isn't that true?

23   A.    No, sir, that's not true.

24           MR. BRODERSEN:  Objection to hearsay, Your Honor.

25   A.    No, it's not true.  He never even said that.

```
1          MR. BRODERSEN:  Objection; hearsay, Your Honor, as

2     to what Mr. Osias may have said to Mr. Robertson.

3          THE COURT:  Well, that door was opened a long time

4     ago.  Overruled.

5     BY MR. HANDBERG:

6     Q.   So he told you that he was doing it at your instruction;

7     didn't he say that?

8     A.   Sir, no, sir.

9     Q.   He's never told you that he was doing it per your

10    instruction?

11    A.   No, sir.  I'd like to see that.  What I remember he said

12    is that I just did what I was told to do.  He didn't say, "I

13    did what you told me to do."  And I wrote him back.

14         THE COURT:  Let's take our morning recess.

15         MR. HANDBERG:  Thank you, Your Honor.

16         (Recess was taken from 10:29 until 10:49 a.m.)

17         THE COURT:  All right, Mr. Handberg.

18         MR. HANDBERG:  Thank you, Your Honor.

19    BY MR. HANDBERG:

20    Q.   Mr. Robertson, in connection with your criminal cases,

21    you've reviewed some of the discovery that's been turned over

22    to you by the United States; is that correct?

23    A.   Sir, yes, sir.

24    Q.   And some of that discovery includes communications

25    you've had with individuals while you've been in jail pending
```

1    trial?

2    A.    Yes, sir.

3    Q.    And one of the pieces of discovery that was turned over

4    was a transcript of a conversation between you and Ms. Wills

5    after she had testified before the grand jury; is that

6    correct?

7    A.    Yes, sir.  I imagine so.  I don't know which one, but,

8    yes, I do remember.

9    Q.    All right.  And when she first discussed with you what

10   she had been asked, your response about who had prepared the

11   tax returns was you didn't think Mr. Osias had even prepared

12   your tax returns; do you remember telling her that?

13   A.    I remember telling her that I don't know what he did or

14   how he did it.  What I meant by that is I don't know if he

15   did it himself or if he turned it over to someone else to do

16   it, those types of things like that.

17   Q.    Okay.  And that is what you said?  You thought that he

18   had turned it over to someone else to do the taxes, right?

19   A.    Like I said, I don't know what he did.  I was saying I

20   don't know what he did.  He could have done this or could

21   have done that.  I can't say.  I wasn't there.

22              MR. HANDBERG:  Your Honor, may I approach the

23   witness?

24              THE COURT:  You may.

25              MR. HANDBERG:  Your Honor, what I'm going to hand

1  the witness is a transcript from October 13th, 2011, of a

2  conversation between Ms. Wills and Mr. Robertson.

3  A.    Thank you.

4  Q.    You're welcome.  Now, Mr. Robertson, I'm going to direct

5  your attention to pages ten and eleven of that transcript and

6  ask you to read it to yourself, and then when you're done

7  with that, let me know and then I'll ask you some questions.

8  A.    Okay.

9  Q.    Thank you.

10 A.    I've read it, sir.

11 Q.    All right.  Thank you, sir.  Does that refresh your

12 recollection on whether you told Ms. Wills that you thought

13 that Mr. Osias had actually had somebody else prepare the tax

14 returns?

15 A.    Could you ask that question again, please.

16 Q.    Absolutely, sir.  Does that refresh your recollection on

17 whether you told Ms. Wills that you thought Mr. Osias had

18 somebody else prepare the tax return?

19 A.    Yes, this does refresh my memory.

20 Q.    All right.  And that's what you told Ms. Wills, correct?

21 You thought Mr. Osias had given the return to someone else to

22 prepare?

23 A.    Yes.

24 Q.    Well, who was that other person?

25 A.    I don't know.

1  Q.   All right.  So that's different than what you're

2  testifying today, where you say that you knew that it was Mr.

3  Osias who would be preparing the tax returns?

4  A.   No, that's not different, sir.  Can I explain?

5  Q.   Yes, please.

6  A.   I turned my paperwork to the taxes for Mr. Osias to do

7  it, okay?  Whether he does it personally or he has it through

8  some other firm or anything like that, I don't know exactly

9  how he gets it done.  I don't follow him up on those types of

10 things like that.  I trust that he's going to get it done.

11         Now, I didn't see him do it.  So I didn't know if

12 he did it or if somebody else did it.

13         Now, the reason why I say that is because when he

14 showed me on his computer, it seemed like he had some website

15 or something like that.  So I didn't know if he was working

16 through another person's license or, like, let's say H&R

17 Block or something like that and it goes to them.  I don't

18 know how it goes.  And that says I don't know, you know, how

19 it does.

20         And she corrects me because she's the one that does

21 know and she corrects me.  "No.  He's the one that does it."

22 She gets the bank information.

23         So it just shows that I don't really know how the

24 stuff get done with the money.  I don't follow it that

25 closely.

1    Q.    And what it also says is that she gave you Mr. Jimenez's

2    tax return to give to Mr. Jimenez, correct?

3    A.    Okay.  Let me see that again.

4          Yes, she does.  She says that.  She says, "I gave a

5    copy of the tax forms to my husband to give to everybody, you

6    know."

7    Q.    And that would include Mr. Jimenez?

8    A.    Right.

9    Q.    And you gave Mr. Jimenez a copy of the tax return that

10   had been prepared?

11   A.    No, I do not remember that, sir.  What I remember is

12   Jimenez giving it to me.

13   Q.    When did he give it to you?

14   A.    Time frame, I think -- I recall when he had gotten

15   his -- his check, okay?  Now, again, I'm not too sure.  I'm

16   not trying to trick you or anything, but I'm -- I'm teaching

17   my class.  So he comes and gives me the paper or something.

18   I put it on my desk right there.  I didn't even look at it

19   until a couple of days later to know that's what it was.

20         Now, what time was that in relationship to him

21   getting his check?  As far as I recall, it was the same time

22   that he got the money, okay?  That's what I remember.

23         Now, it's not farfetched for me to agree with you

24   to say that she probably gave it to me to give to him.  It

25   doesn't mean I looked at it.

1

2    Q.    Well, did you look at it?

3    A.    Not until I got ready to file it in my -- my -- in my

4    cabinet.

5    Q.    Okay.  And when did you file it in your cabinet?

6    A.    After he had given it to me and I put it on my desk for

7    a few days, and I believe that was around the same time that

8    he cashed the check, the same time frame.

9    Q.    All right.  So where did you put it in this cabinet?

10   A.    Well, behind me in my office.

11   Q.    Which house?  I'm sorry.

12   A.    I'm sorry.  The -- Ms. Wills' house.

13   Q.    All right.  Continue.

14   A.    In my office, there's a metal container that I put

15   assorted amounts of things in.  When he had expressed to me

16   that he wanted it to be saved and I told him that he should

17   save it, I said I would make a file for him for it so it

18   wouldn't get lost, and that's when I put it on my -- my -- my

19   inbox to do things.  I didn't look at it at that time, okay?

20   I knew what it was, basically, but I didn't look at it.

21          When I made time, and that was some days later, to

22   put it up, that's when I looked at it and noticed what was

23   the -- the -- the actual details of the form.

24   Q.    And so that's when you realized that three of your

25   children were on his return?

1    A.    Right.

2    Q.    And you had never asked him to do that, did you?

3    A.    No, sir.

4    Q.    And is that when you learned the amount of the refund

5    that he was receiving?

6    A.    I didn't even know the amount of the refund at that

7    time.  I didn't even get that far.  I didn't know the amount

8    of the refund he was receiving, you know, the details of that

9    until I got into jail.  All that stuff, I never paid

10   attention to his money or how much he got exactly and all of

11   that.  I always relied on either Ms. Wills telling me or Tony

12   Osias, and then I would forget it as soon as they told me

13   because it ain't that serious.  It wasn't my business like

14   that, you know.

15   Q.    Well, and part of the transcript that's admitted into

16   evidence as Defense Exhibit 1 is discussions with you and Mr.

17   Al-Hanafi where you talk about you ask your -- you ask Ms.

18   Wills, "How much money does he have," right?

19   A.    Right.  You see, at that time I'm asking him because I

20   didn't know.  "How much money does he have?"  And that's

21   after he's cashed the check.  So that again shows I didn't

22   know before he even -- when he put the check in the bank, I

23   didn't know how much he was putting in the bank or how much

24   he took out; but my wife informed me at that time, after he

25   had disappeared and we thought he went on a drug binge, that

1    this is how much he actually has.

2              So that's when I became aware of at least -- and

3    it's still that.  I couldn't tell you how much he got, you

4    know, but, that's why I know he had -- he was down some

5    money.

6    Q.   And you knew it was a couple thousands dollars, at

7    least?

8    A.   Right, I did know it was about $5,000.

9    Q.   Did that strike you as a large return for Mr. Jimenez?

10   A.   I don't know.  I don't know about taxes like that.  I

11   don't know what's a large return or not a large return for

12   it.  I don't know.

13   Q.   But you were going to have your wife put a freeze on his

14   account, correct?

15   A.   Yes, sir, I did.

16   Q.   Because that money was for a specific purpose, correct?

17   A.   No, sir, that's not why I wanted to put a freeze on his

18   account.

19   Q.   And usually dudes charge you for that type of work,

20   right?

21   A.   Right.  That's true.

22   Q.   How much do people usually charge to have people -- to

23   have children added to tax returns?

24   A.   No.  I don't know.  From what I've heard from people

25   talking about it, I know -- I would say probably $1,000 I

1   think they charge people, those guys, when they do that, they

2   do that type of stuff like that.  I would say $1,000, but I

3   couldn't tell you with a firmness.

4   Q.    And you hadn't charged him anything for his --

5   A.    That's not how -- you're -- you're -- you're

6   interpreting it incorrectly.  If you want to be honest, I can

7   tell you what -- what I'm talking about here, okay?  But the

8   way you're -- you're -- you're construing it is just slightly

9   different from what actually is happening.

10  Q.    Well, and the portion that I'm asking you about is a

11  statement that you make to Mr. Al-Hanafi, correct?

12  A.    Okay.  We're finished with this one here?

13  Q.    Yes, sir, I'm done with that one.

14  A.    Okay.

15  Q.    It's a statement to Mr. Al-Hanafi where you're telling

16  him, "So, you know, usually dudes charge you for that type of

17  work, you know"?

18  A.    Right.

19  Q.    So that's something you said?

20  A.    Yes, that is, but the context that you're -- what

21  context do you mean it in and I'll tell you if that's the

22  context that I said it in.

23  Q.    Well, I mean, the context of the statement is you didn't

24  charge him for you putting three of his (sic) children on his

25  name, correct?

1    A.    No, that's not the context.   That's why I asked that we

2    read the whole thing, because the context builds from the

3    beginning that I am teaching this young man and trying to

4    mentor him, you know, and he has -- usually people give --

5    have to pay big funds and stuff like that to get into

6    programs and to go through all the hoops I've been going

7    through with me and my family with this guy.   He -- usually

8    these things cost a lot of money and we're doing this out of

9    love, trying to help him out and everything like that.

10            And, no.   That's the context that we said it in --

11   that I said it in.   I'm sorry.   Sometimes I say "we," because

12   I'm speaking for my family as well, you know.

13   Q.    Well, but in the transcript, you're not saying, "we."

14   It's "I."   "I helped him," "I made him," "I put three of my

15   children on his name," those are the words you chose, right?

16   A.    Sir, yes, sir.

17   Q.    All right.   And you didn't say, "I just learned," did

18   you?

19   A.    No, sir, I did not, because at that time I didn't just

20   learn.

21   Q.    But there is something you do talk to Mr. Al-Hanafi

22   about, something that had happened in the past, and that

23   deals with Ra.   Who is Ra?

24   A.    Ra is a friend of mine.   He's a contemporary of myself

25   and Mr. Mustafa.   He's our age group.

1  Q.   And you had had a conversation with Ra about putting

2  children on tax returns, hadn't you?

3  A.   You see, the way you word it is very slick.  I didn't

4  have a conversation with him as though I instigated it.  Ra

5  called me and asked me, tried to solicit me to put on my

6  children on -- some of my children on his taxes, and I

7  rejected him.  I told him no, I would not do that.

8          So what I was afraid of is that Ra would hear that

9  I allowed -- and that's what that statement says.  That's why

10 I let the young boy do it, because Ra would find out that I

11 let the young guy do it, okay, and then be upset, say why

12 would I let that, and he wouldn't understand that what I'm

13 stopping him from doing is something illegal and what the

14 young guy is doing is something different.

15 Q.   And when you said that you let the young guy do it,

16 you're talking about letting Mr. Jimenez claim three of your

17 children on his tax returns?

18 A.   No.  What I'm talking about is not making him amend his

19 taxes.  So then by me not making him amend his taxes, not

20 pushing that issue, then I accepted that, okay, I allowed it,

21 only because Mr. Tony Osias did it, and if he did it, I'm

22 relying on him that it's legal, not that it is something

23 wrong here.  Being that it's legal, on that foundation, I'm

24 going to let it slide.

25 Q.   Well, there's nothing in any part of this recorded

1  conversation where you say that anyone told you this was

2  legal, do you?

3  A.    Do I have to say -- if I tell somebody to go to the

4  store, do I have to say, "Go to the store and buy something

5  but don't steal"?

6          When I send someone to do a particular job, do I

7  have to say, "Don't do an illegal thing," or is it understood

8  when you send somebody who is a professional to do something,

9  you expect them to do a professional job or do I have to say

10 every time, "Go there and do your taxes, but don't do it

11 illegally"?

12 Q.    Well, you're explaining in this conversation what

13 happened to Mr. Al-Hanafi?

14 A.    In brevity, sir.  In brevity.  In brevity.

15 Q.    And you explain to him how you, I, made him do, Jimenez,

16 his taxes and put three of your children on there?  You're

17 explaining how --

18 A.    You're combining -- you're combining two things, and I

19 agree with one of them.  I agree that I did make Jimenez do

20 his taxes; and I agree that after the fact, after I knew

21 about it, I allowed it to stay that way once I found out that

22 he had my daughters on there.

23          I've asked for you guys to produce the -- the --

24 the phone conversation.  I know my phone was tapped.  I've

25 been on tap since 19 -- 2008.  So I know my phone has been

1    tapped.  I've been asking -- asked for Jenkins (sic) so we

2    can bring the conversation and you would hear me saying to

3    him, "What makes you think I would allow this?"

4            I don't have anything to hide, bro'.  I -- I

5    preferred it to be all the information put out.

6    Q.    Well, one in one of the requests that you had your

7    lawyers make recently was for copies of any conversations

8    between you and Mr. Osias --

9    A.    Over -- over two years ago.

10   Q.    -- where he's authorizing or telling you that this was

11   okay; is that correct?

12   A.    No, no, no, it's not that he's authorizing or saying

13   that it's okay.  The conversations that I was asking for were

14   the conversations that took place since, let's say, January

15   or whenever we started doing the taxes until the time of my

16   arrest.  In there is a conversation, the conversation that

17   I'm talking about, that I called Tony Osias.

18           Now, my phone was tapped, okay, and I called Tony

19   Osias and said to him, "Why did you do this?"  That's my

20   first impression, my first time knowing that this thing

21   happened, and I wanted that to come in here so that we can

22   see it.  Since we don't have it, I have to just testify about

23   it and say what happened.

24           But that's when I found out.  From that point on, I

25   accepted it as reality and I felt that it was my fault for

1    not being on top of the situation; but at all times I felt

2    that it was legal because he's a tax preparer and I didn't

3    feel that he would do it and it not be done -- you know,

4    something illegal.  Even if it was a mistake, I didn't think

5    that it was illegal.

6         I didn't -- of course, didn't tell him to do

7    anything illegal and there was no assumption from our

8    conversation to help him do his taxes, wink, wink, "Do

9    something slick."

10        I particularly told him from the very beginning, "I

11   don't want to use you because I don't want no slick stuff."

12   I said, "I want a professional job."  And the only reason I

13   then did use him is because he told me he was a professional

14   and he showed me he had a license.  That's how I saw his

15   website, because he said he has a particular number that he

16   has to do it from, okay?

17   Q.    And your testimony is once you learned what had

18   happened, you then contacted Mr. Osias to confront him on

19   what had happened?

20   A.    On the phone, yes, I did.

21   Q.    And to close the loop on this, you've been advised at

22   this point that the United States doesn't have any of those

23   conversations you think exist, right?

24   A.    Well, you know, I -- I've been asking for two years.

25   I've been in Seminole County for two and a half years now,

1    approximately.  I know that I was on -- my phone was being

2    tapped, you know.  I know I've been under FEISA.  I know

3    that -- and after I had an argument with the C.I.A. in 2000,

4    I think, '7 --

5            MR. HANDBERG:  Objection.  Move to strike.

6            THE COURT:  Sustained.

7            Let's keep the C.I.A. out of it.

8            THE WITNESS:  Sir, yes, sir.

9    A.   I know that at a particular time in 2007 my stat -- my

10   security status as a citizen of the United States changed and

11   I was entered on what they call TIDES, okay?  At that

12   point -- I know what tides is.

13           MR. HANDBERG:  Objection.  Move to strike.

14           THE COURT:  Sustained.

15           THE WITNESS:  Can I say?

16           THE COURT:  Well, you're just not answering the

17   question.

18   A.   I'm sorry.  Please reframe it -- repeat the question so

19   I can answer it, sir.

20   Q.   My question was, you at this point have been advised

21   that the government has searched for those conversations you

22   say exist and your attorneys have advised you that there's no

23   such conversations, correct?

24   A.   No, they have not advised me that there's no such

25   conversations.

1  Q.   All right.  And you never made Mr. Jimenez return any of

2  the money, did you, to the I.R.S. that he received?

3  A.   Why would I?

4        I don't understand the question.  I don't

5  understand what obligation I have for that.  I'm sorry.

6  Q.   When you saw the return where you saw that he had three

7  of your children listed as his children and he had received

8  money in response to that, you let him keep the money?

9  A.   No, it's not me who let him keep the money.  Actually,

10  what I said is, well, they -- they did the taxes.  The I.R.S.

11  did that.  They have their -- their thing.  Obviously, if

12  they did it, it must be correct.

13        I relied on the tax preparer.  I'm not a tax man.

14  I'm a layman.

15  Q.   Well, you know whether or not those children are your

16  children, don't you?

17  A.   No, sir.  I -- that's not the question to me.  The

18  question wasn't whether they're my children or not.  The

19  question is, was the tax report done correctly or not?

20        I'm not the one to say it wasn't.  Since he got a

21  return and since the tax preparer did it, I relied on them

22  that all the information that they did was correct and legal.

23  Q.   So you thought it was legal for Mr. Jimenez to say that

24  three of your children were his children?

25  A.   We're playing semantics.  On the tax form, it does say

1  that the person qualifying does not have to be your

2  offspring.  In that regard, after the -- I realized that he

3  had done the tax report, yes, I figured, yes, he can claim

4  them as "child."  The form says itself "child" -- what do you

5  call it? -- "son," "daughter."

6         He didn't claim them as his children in the sense

7  that they're his offspring.  He claimed them as "child."  And

8  I don't know what the generic term he should have used, but I

9  knew it said "son," "daughter," "stepdaughter," "grandchild,"

10  "niece," et cetera, et cetera.

11         I know "et cetera" means more than that -- those

12  words can be used.  Whichever words he used, I'm not trying

13  to figure it out for him.  That's what I sent him to Tony

14  Osias for to do.

15         MR. HANDBERG:  Your Honor, may I approach the

16  witness?

17         THE COURT:  Sure.

18  A.   Thank you.

19  Q.   All right.  Mr. Robertson, I've handed you what's been

20  marked as Government's Exhibit 1-A.  Do you recognize that as

21  being Mr. Jimenez's 2010 tax return?

22  A.   Yes, sir, I do.

23  Q.   All right.  And under Dependents, the three dependents

24  who are listed, those are your children, correct?

25  A.   Sir, yes, sir.  Yes, they are.

1   Q.   And in column three, it says, "Dependent's relationship

2   to you;" am I reading that correctly?

3   A.   Sir, yes, sir.  You are.

4   Q.   And so Mr. Jimenez is representing that the three

5   children listed on this return, their relationship to him is

6   his child; is that correct?

7   A.   Yes, sir.

8   Q.   All right.  So you saw that?

9   A.   Yes, sir, I did.

10  Q.   And it's your testimony that you thought that was okay

11  for him to say they were his children?

12  A.   Yes, sir.

13  Q.   All right.  And if you turn to the fourth page of the

14  exhibit, there's a schedule EIC.  Tell me when you're at that

15  page.

16  A.   I -- I think it says -- is this the one right here?

17  Q.   Yes, sir.

18  A.   Okay.

19  Q.   All right.  And that has the names and Social Security

20  numbers and dates of birth of the same three children we saw

21  on the first page; is that correct?

22  A.   Yes.

23  Q.   And those are your children?

24  A.   Yes, sir.

25  Q.   And you see in row five it says, "Child's relationship

1   to you."  So the "you" in that would be Jimenez, right?

2   A.    Right.

3   Q.    And he says they're his children, correct?

4   A.    Well, we have to define what you mean by "his children,"

5   because here -- it says here, for example, "Son, daughter,

6   grandchild, niece, nephew, foster child, et cetera."

7           Now, with this "et cetera," as far as I know, that

8   means it could be other words used as well.  I don't know

9   what words should have been used for someone who lives in a

10  house as the head of household, brings money to that home and

11  is claiming a child.  That is not his physical child.

12          I didn't try to figure all of that out.  That

13  was -- I never even thought about this like that.  All I knew

14  is that the thing might be able to be done.  That's why I

15  told him, "Go to Tony Osias.  Explain everything to him and

16  let him figure it out."

17          Once I it post-fact, I assumed the same thing; that

18  Tony Osias, as a qualified tax preparer, knows what he was

19  doing and this is legal, even if it's distasteful.

20  Q.    All right.  And then the next row talks about number of

21  months child lived with you in the United States during 2010.

22  Do you see that row?

23  A.    Yes.  I didn't see this row.  To be honest with you, I

24  didn't pay attention to this detail here, this one here,

25  number six, until after I got locked up, okay?

1    I didn't go through this guy's taxes, sir.   I

2    didn't go through the paperwork like this and look at all

3    these details.   That's not my job.

4    Q.    Well, you've just testified that you did.

5    A.    No, I did not.   I don't know what you heard, but I know

6    what I said.   I didn't say I went through his taxes like

7    this.   What I said is I sent him to Tony Osias and told him

8    to explain everything to Tony Osias so he can do it.

9          When I saw my children, I saw the first page -- I

10   didn't flip through all of this.   I don't even know if I had

11   all of this, to be honest with you; but I do recall this

12   first page.   That's all I saw and that's what I went off on.

13         Now, when I did see this after arrest, I said, "Why

14   did they do that?"   I said, "That's -- that's stupid to me."

15   Why would he write down twelve months at the residence for

16   September -- or was it in 2010?

17   Q.    For 2010.

18   A.    When he was only there since November?   Okay.   Now, I

19   knew he had to claim residence at our house because he was

20   living there, but shouldn't he have claimed how many months

21   he was actually living there?

22         The paper says that if the child lived with you for

23   more than half of 2000 or less than seven months, why didn't

24   he just answer it honestly?

25         Again, I tell these guys, "Pay attention to

1   detail."  But I did not do this and I did not review this and

2   I did not supervise this.  I simply gave a general direction:

3   Go to a tax preparer.  Go to the one that I go.  Tell him

4   everything, because I know the guy is not too bright.  Tell

5   him everything and he'll help you figure out what you're

6   supposed to do legally.

7            Now, afterwards, yes, I accept responsibility for

8   not standing on their heads, but there was no criminal

9   conspiracy on my part on a combination to talk with somebody,

10  go cheat on his taxes.  I didn't do that.  I just didn't do

11  that.  I just told him, "Go do your taxes."

12  Q.   Would you agree with me that the representation that

13  those children lived with him for twelve months was false?

14  A.   Yes, sir, I agree with you 100 percent.

15  Q.   And Tony Osias would know whether or not that's correct,

16  wouldn't he?

17  A.   Yes, sir, he would.  He went with me to pick up Jimenez

18  from the airport.

19  Q.   In November of --

20  A.   And he took -- and he went with me to drop Jimenez off

21  at the airport when he left.

22  Q.   And Mr. Osias would know that these are your children?

23  A.   Yes, he would know they were my children.

24  Q.   And your -- strike that.

25            So Mr. Jimenez used your daughters' information on

1  this tax return in this way without your knowledge, is your

2  testimony?

3  A.   Until after the fact, yes.  Without my prior knowledge

4  to it being done, yes, sir, that is my testimony.

5  Q.   All right.  And you kept a copy of his tax return in

6  your house?

7  A.   After he gave it to me -- after he received his check, I

8  believe I did keep a copy.

9  Q.   And your testimony is the only part of that tax return

10 you looked at was the first page?

11 A.   That I recall, sir.  To the best of my knowledge, I -- I

12 probably flipped through it, but I don't recall paying

13 attention to any of those details like that, no.  I did not

14 inspect his tax return and look through it to see if it was

15 correct.  I just want to make that character -- that

16 clarification.  I did not do any of that.

17 Q.   All right.

18 A.   I trusted that it was correct, based on the one who

19 prepared it.

20 Q.   And even after learning that it had not been prepared

21 correctly, you didn't make any efforts to return any of the

22 money to the government, did you?

23 A.   That's -- we need to clarify what that means,

24 "correctly," you know, because we have two different

25 understandings here.  "Correctly," do you mean legally or

1  "correctly," then you mean the way I would have expected it

2  to be done?

3  Q.    What's the difference?

4  A.    The difference is that I would have expected him to come

5  talk to me and I would have expected him not to have my

6  children on his taxes, especially my older children on his

7  taxes.

8         Now, if he would have come to me and I thought if

9  he would have done something and spoke to me about it, maybe

10  I would have done that.  I don't know.  If he would explained

11  it to me.  But did I think it was incorrect to the point of

12  illegality?  No.  How am I going to speak over Tony Osias

13  when he's a tax preparer and I'm not?  So I did not know that

14  it was illegal.

15  Q.    Is Tony Osias your friend?

16  A.    I believe so, at least prior to this.

17  Q.    All right.  And he is a prior federal felon for drug

18  trafficking?

19  A.    I have no idea about Tony Osias's federal or any type of

20  his crimes -- what do you call it? -- prior to coming to jail

21  and starting this -- this lawsuit here.

22         I did know that Tony Osias had been in the feds.  I

23  didn't know how many years he had done in the federal

24  penitentiary or anything like that.  I never asked him about

25  his crimes.

1   Q.    And you used him for your tax returns?

2   A.    Yes, sir.

3   Q.    And you're a prior felon as well, correct?

4   A.    Sir, yes, sir, I am, a prior felon.

5   Q.    I think it was -- you have the three felonies from the

6   '90s and then plus you have the new felony you've pled to on

7   the possession of a firearm?

8   A.    Yes, sir.

9          MR. HANDBERG:  May I have a moment, Your Honor?

10         THE COURT:  Yes.

11   BY MR. HANDBERG:

12   Q.    Were you the one who asked Ms. Wills to be on Mr.

13   Jimenez's account?

14   A.    No, sir, I was not.  If I remember correctly -- I'm

15   sorry.  May I answer you?

16   Q.    Yes, please.

17   A.    Okay.  I gave -- I told Mr. Jimenez -- how can I say

18   this?  I gave him advice.  I told him, "Look, you're going

19   overseas.  You should ask" -- I suggested to him, "You ask

20   one of my wives to be on the account with you so that they

21   can send you money while you're overseas studying," studying

22   Islamic knowledge.  That's what I asked him -- I suggested

23   him to.

24          I even told him he could pick other people, even

25   Mr. Tony Osias.  That's what -- I gave him these type of

1    advices.  He chose Ms. Wills.

2    Q.    Would you agree that you were the ultimate decider on

3    whether or not Mr. Jimenez would be allowed to use the money

4    from his tax return?

5    A.    No, not exactly.  No, I would not agree with that in

6    totality.  May I speak more?  Because I don't want to come

7    too far.

8    Q.    You can explain your answer.

9    A.    Okay.  Mr. Jimenez is a 25-year-old grown man.  I tried

10   to impress upon him some things.  I tried to be firm, but

11   ultimately he does what he wants to do, okay?

12           I may wolf, scream, holler, but he still does what

13   he wants to do, which is shown now, in the course of the time

14   that he's with me, he did what he wanted to do; and I, and it

15   says in the same transcript, say I'm not going to force him

16   to do anything.  I give him direction.  He takes it or he

17   doesn't take it.

18           I'm just watching to see how he's going to be, if I

19   was to give him my word as a scholar to send him over to that

20   school and then he's going to act like a fool.  So I'm

21   watching.  I'm saying, "Do this," and see what he does.

22           So, no.  It's his money, you know.  I'm not going

23   to say, "Hey, you can't have this.  You're going to stop.

24   You know, you're not going to use this until you get yourself

25   straight."

```
 1            He could say, "Damn you.  Give me my money.  It's
 2   mine."  I would give it to him.
 3   Q.   You didn't give it to him when he left for New York?
 4   A.   He didn't ask for it.
 5   Q.   And you still had that money in your house --
 6   A.   I still did.
 7   Q.   -- when the search warrant was executed, correct?
 8   A.   Yes, sir.  That is correct.
 9   Q.   Thank you, sir.  No further questions.
10            THE COURT:  Any redirect?
11            MR. BRODERSEN:  Briefly, Your Honor.
12                    REDIRECT EXAMINATION
13   BY MR. BRODERSEN:
14   Q.   Now, Mr. Robertson in 2011, when the tax return at issue
15   was prepared, do you know whether or not Mr. Osias had the
16   names and Social Security numbers of all of your children?
17   A.   Yes, sir, I do know.
18   Q.   And how did you know that he had that information?
19   A.   I gave it to him when I was in New York City.
20   Q.   Okay.
21   A.   Over the phone.
22   Q.   Did you give him that information for the preparation of
23   the prior year's return?
24   A.   No, sir, I did not.  I gave him the information so he
25   would know my whole household and prepare for us to be down
```

1    here.

2    Q.    Okay.

3    A.    Part of our agreement was that he was going to -- he

4    would be my go-to man if I needed something.  So he needed to

5    know my family.

6    Q.    Okay.

7    A.    Even if we needed to go to the hospital, he was the one

8    that we went through to even go to the hospital.

9    Q.    He also prepared your 2009 tax return, the year before,

10   correct?

11   A.    Yes.

12   Q.    You and your wives?

13   A.    He did mine.  He did Ms. Itisha Wills'.  He did

14   everyone's except Mckeen's and Nazeer Mujahed.

15   Q.    Those are employees at The FIKS?

16   A.    Right.  Yes, sir.

17   Q.    All right.  Now, in the preparation of that prior year's

18   returns, do you know whether all of your children were

19   claimed on your return?  When I say, "your return," I mean

20   your tax return and your wives' returns.

21   A.    No, I don't know.  You see, that's the problem, and I

22   kick myself in the butt now because I didn't pay attention to

23   those things.  If you ask me, I couldn't tell you; but I know

24   who I would go to to find out.  I would go to Ms. Wills or I

25   would go to Tony Osias.  They remember these types of things.

1    Q.    Now, just so everybody's clear, you did not learn that

2    your children -- your daughters had been claimed on Mr.

3    Jimenez's tax return until approximately the same time that

4    he received the refund check?

5    A.    Yes, sir.

6    Q.    So you didn't review the return prior to it being filed,

7    correct?

8    A.    No, sir, I did not review the file ever until after I

9    got locked up.  I looked at the first page and -- after he

10   got -- after he gave it to me.

11   Q.    The -- there was a portion of the conversation that you

12   had on June 17th with Mustafa Al-Hanafi where you indicated

13   that you, and I'm quoting you, "I let the young guy do it."

14   I think Mr. Handberg during cross-examination was intimating

15   that that was you let the young guy claim your children on

16   the taxes.  Is that what you were referring to?

17   A.    I was -- what I was saying is yes and no.  Yes, after

18   the fact, meaning that after all that stuff happened, then

19   when I saw it, I let it lay.  I let it remain the way it was

20   and allowed it, because, again, I -- I -- I thought

21   ultimately -- I never thought about illegalities.  It never

22   crossed my mind that it was illegal; but what I was thinking,

23   I could make this guy take this stuff off because he

24   didn't -- they didn't ask.  They just went about it

25   backwards, you know, and so I just let it lay.

1   Q.    You were aware at the time that you could have asked him

2   to amend the return?

3   A.    Yes.

4   Q.    Why didn't you ask him to amend the return?

5   A.    I didn't ask him to amend it because it was already

6   finished, number one, and it was already done; and I felt

7   that it was kind of my fault that I didn't pay attention to

8   the way they did it in the beginning, okay?

9         Mind you, again, I'm not thinking this is illegal.

10  I'm just thinking they did this without thinking about what

11  they were doing and the ramifications behind it.

12        So, I mean, plus, he was going to go overseas and

13  study.  So some good might have come out of it at the end.

14        So I said, okay.  Well, you know, they did it, you

15  know, backwards.  I'm not going to make a stink when I should

16  have made a stink in the beginning.

17  Q.    You were also asked by Mr. Handberg during cross-

18  examination that -- your testimony was that you didn't return

19  the money to the I.R.S.  Did you believe that that money at

20  any point in time was your money?

21  A.    No.  No, sir, it was not my money.

22  Q.    Did you believe that you had the ability or authority to

23  return the money to the I.R.S.?

24  A.    No, sir, I did not.

25            MR. BRODERSEN:  Nothing further, Your Honor.

1          THE COURT:  All right.

2          MR. HANDBERG:  Nothing further from the United

3     States.

4          THE COURT:  Thank you, Mr. Robertson.  You can step

5     down.

6          THE WITNESS:  Thank you.

7          THE COURT:  What's next?

8          MR. BRODERSEN:  Your Honor, at this point we'd call

9     as a brief character witness Michael Bell.  I'll go out in

10    the hallway and get him, Your Honor.

11         THE COURTROOM DEPUTY:  Please come forward, sir, to

12    be sworn.  Come all the way up here and I'll swear you in.

13    All the way.  You can come all the way up front.

14              Please raise your right hand.

15                         MICHAEL BELL,

16    having been first duly sworn, was examined and testified as

17    follows:

18         THE COURTROOM DEPUTY:  Thank you, sir.  You may be

19    seated in our witness box right over there.

20                    DIRECT EXAMINATION

21    BY MR. BRODERSEN:

22    Q.   Good morning, sir.  Can you please state your name.

23    A.   Mike Bell.

24         THE COURT:  Mr. Bell -- excuse me -- pull that mic

25    a little bit.

1           Mr. Bell, I'm over here.

2           MR. BRODERSEN:  The Judge is over there.

3           THE WITNESS:  Oh, I'm sorry, sir.

4           THE COURT:  Just make sure we can hear you, okay?

5   So skooch it up a little bit.

6           There you go.  Thanks.

7           THE WITNESS:  Is it good now, sir.

8           THE COURT:  That's good.  Thanks.

9   BY MR. BRODERSEN:

10  Q.   Mr. Bell, do you know an individual by the name of

11  Marcus Robertson?

12  A.   Yes, sir.

13  Q.   And when did you first meet Marcus Robertson; do you

14  remember?

15  A.   I met him at my gym.  I run a gym.  I teach kickboxers

16  and martial artists.

17  Q.   Okay.  And do you recall this being several years ago

18  that you met him?

19  A.   Yes.  But how he know me, by watching TV or looking on

20  the tube, he seen me fighting.  He seen me beating up people.

21  Q.   Okay.  Do you have -- did you have a career as a

22  professional kickboxer?

23  A.   Yes, sir, Champion of the World ten and a half years.

24  Q.   Okay.  And you now run a gym where you teach that to

25  people?

```
1    A.    Yes, sir, I do.

2    Q.    And was Mr. Robertson one of your students?

3    A.    Yes, sir.

4    Q.    Okay.  Did you work with him on a daily basis?

5    A.    Yes, I did.  Early in the morning when my classes start,

6    I have a class for them and a class for -- the class is open

7    for everybody, but they get in it a lot more earlier than the

8    other peoples.

9    Q.    So he would come in first thing in the mornings just

10   about every day?

11   A.    Yes.

12   Q.    And during the course of his working as your student,

13   did you come to know him as an individual?

14   A.    Come to be good friends, sir.

15   Q.    Okay.  Based upon your knowledge of him, do you believe

16   him to be a law-abiding citizen?

17   A.    Yes.

18         MR. BRODERSEN:  I have no further questions, Your

19   Honor.

20         THE COURT:  Any cross?

21         MR. HANDBERG:  No, Your Honor.

22         THE COURT:  All right.  Thank you, Mr. Bell.

23   Appreciate your coming.

24         THE WITNESS:  Yes, sir.

25         MR. BRODERSEN:  Your Honor, I call Itisha Wills,
```

1    who is outside also.

2              THE COURT:  Okay.

3              THE COURTROOM DEPUTY:  Please come forward, ma'am,

4    to be sworn.  You can come up to the front here and I'll

5    swear you in.  That's fine.  Please raise your right hand.

6                        ITISHA WILLS,

7    having been first duly sworn, was examined and testified as

8    follows:

9              THE COURTROOM DEPUTY:  Thank you, ma'am.  You may

10   be seated in our witness box.

11                    DIRECT EXAMINATION

12   BY MR. BRODERSEN:

13   Q.   Please state your full name, please, ma'am.

14   A.   Itisha Sieda (phonetic) Wills.

15   Q.   Could you pull that microphone closer to you so that

16   everyone can hear.

17   A.   Yeah.

18   Q.   Ms. Wills, do you know an individual by the name of

19   Marcus Robertson?

20   A.   Yes, I do.

21   Q.   And how long have you known Marcus Robertson?

22   A.   About eight years.

23   Q.   Are you, in fact, one of his Islamic wives?

24   A.   Yes, I am.

25   Q.   And how long have the two of you been married?

1    A.    Close to seven years, actually.

2    Q.    And prior to his being arrested and incarcerated in this

3    case, did the two of you reside together?

4    A.    Yes, we were residing together.

5    Q.    And that was here in Orlando?

6    A.    Yes.

7    Q.    Okay.  Now, are you involved at all in the business

8    known as The FIKS?

9    A.    Yes, I was.

10   Q.    Okay.  What was your -- what has your involvement been

11   since you've been in Florida?

12   A.    Well, my involvement was to handle all the finances of

13   the business.

14   Q.    Do you have any background in finance?

15   A.    I don't, but I have -- meaning in the work world, no,

16   but I do have an undergraduate and master's degree in

17   business.  So I kind of learned all about the money, if you

18   will.

19   Q.    Would it be fair to say that you handle all the

20   financial affairs of The FIKS during the years 2009, 2010,

21   2011?

22   A.    Well, 2009, the business wasn't incorporated yet; but

23   2010 and 2011, before my husband was arrested, yes.

24   Q.    Okay.  And did Mr. Robertson have any real involvement

25   in the financial affairs of the business?

1   A.   No, he did not.

2   Q.   Did you work together at all with an individual by the

3   name of Tony Osias?

4   A.   No, I never worked with him.

5   Q.   Okay.  So he didn't have anything to do with The FIKS?

6   A.   No.

7   Q.   Okay.

8   A.   Not to my -- no.

9   Q.   Okay.  Did you know that he was the person who prepared

10   your tax returns?

11   A.   I learned that when he came my door and wanted me to

12   sign all of the forms so that he can mail it out or submit it

13   to the I.R.S. in a timely fashion.  That's the only time I

14   knew that he was doing our taxes for whatever year that was

15   recently.

16   Q.   Okay.  Now, who would be in charge of the finances of

17   your household?

18   A.   That was me, actually.

19   Q.   Okay.  And did Mr. Robertson have any involvement in the

20   finances of the household?

21   A.   I wish he did.  No, he didn't.  He never had any

22   involvement.

23   Q.   Okay.  There was an individual by the name of Jonathan

24   Jimenez.  Do you know him?

25   A.   Yes.

1  Q.    And for a period of time in 2010 and 2011 Mr. Jimenez,

2  part of the time, resided at your home?

3  A.    Yes, he did.

4  Q.    And did you come to know him during that time period?

5  A.    Yeah, I got -- just from "Here's your food," the

6  bathroom was clean.

7  Q.    Was there a point in time in 2011 when Mr. Jimenez asked

8  you to become a signatory on a bank account that he had?

9  A.    Jimenez?

10  Q.    Yes.

11  A.    Yes.

12  Q.    And, to your knowledge, did Mr. Robertson have any

13  involvement in that?

14  A.    No, he did not.

15  Q.    Did you go to the bank with Mr. Jimenez to actually

16  become the signatory?

17  A.    I did.

18  Q.    And did Mr. Robertson travel along with you that day?

19  A.    He traveled with us, but he sat in the little area where

20  they have the coffee and stuff with my daughter -- my two

21  daughters at the time --

22  Q.    Okay.

23  A.    -- while Mr. Jimenez and I went to the window and did

24  everything.

25  Q.    Do you know whether he had any knowledge of the

1    transaction that was occurring at the bank that day?

2    A.    No, he did not.

3    Q.    During the point in time when you became signatory of

4    the bank account, did you maintain any sort of control over

5    Mr. Jimenez's money?

6    A.    No.

7    Q.    Could he withdraw money as he saw fit?

8    A.    He could.  From what I understand, he had his own

9    personal debit card.

10   Q.    And did he -- to your recollection, did he withdraw

11   money as he saw fit?

12   A.    I mean, when my husband was out of town, I didn't see

13   Jimenez ever.  So I don't know what he did with his funds.

14   Q.    So Mr. Jimenez was only around you when your husband was

15   around?

16   A.    Yeah, that was the only time.

17   Q.    Okay.  Now, do you recall the day that the federal

18   police executed the search warrant on the home?

19   A.    I do, actually.

20   Q.    And one of the things that they took was something that

21   was -- an envelope or a couple of envelopes that were

22   entitled Valuable Papers Yahyah; did you know that?

23   A.    No.

24   Q.    Okay.  Did you know that they recovered bank account

25   records from the home?

1  A.    Yes.  I recall being questioned by Attorney Handberg

2  when I was summoned to. . .

3  Q.    The grand jury?

4  A.    -- to the grand jury that he mentioned that to me.

5  Before that, I had no idea what was taken, because our house

6  was not so pretty.

7  Q.    Did you know that there contained within the bank

8  records or the records relating to the tax refund monies that

9  Mr. Jimenez received, that there were I.O.U.s found?

10  A.    Yes.

11  Q.    Okay.  And how did that come about; do you know?

12  A.    About the I.O.U.s?

13  Q.    Right.

14  A.    Well, from what I can recall back then was that any time

15  there was money for, like, the gardener or groceries or gas

16  money for the cars, I would write an I.O.U. and just let my

17  husband know, "Okay.  You know, I took $20," or $30 or $50,

18  "here so that I can do a little groceries," or Pampers or

19  whatever the case.

20        He's like, "Okay.  Don't tell me.  Whatever," and

21  that was pretty much it.

22  Q.    So the idea was there that if Mr. Jimenez's money was

23  utilized for those purposes, that he would be paid back?

24  A.    From what I -- I don't -- from what I understand, yes --

25  Q.    Okay.

1  A.    -- because, you know, he's a young guy, you know.

2  Q.    Now, do you ever recall there being an instance when

3  some of the money was utilized to pay rent?

4  A.    Wow.  I can't recall right off the top, to be honest

5  with you.

6  Q.    All right.  Now, it's my understanding that there was

7  about -- a little over $600 in cash that was found at the

8  house that was money that was Mr. Jimenez's.  Do you know

9  why -- there was a reason why he kept that amount of cash at

10 the house?

11 A.    I don't know why he kept cash at the house, but from,

12 you know, just him being a young man or wanting to buy food

13 out and stuff like that.  I mean, any person in their right

14 mind would want to keep a little money on them; but that

15 amount, I don't know why.

16 Q.    Okay.  But it was his money to -- that he was free to do

17 with what he felt necessary, correct?

18 A.    Yes.

19 Q.    And did you know that that money had come from a tax

20 refund check?

21 A.    No.

22        MR. BRODERSEN:  The Court's indulgence for one

23 moment?

24        THE COURT:  Okay.

25 BY MR. BRODERSEN:

1   Q.   Just to be clear, with regard to the money that Mr.

2   Jimenez kept in his bank account and the money that was kept

3   at the home -- at your home, do you know where that money

4   came from?  Do you know the source of that money?

5   A.   Well, from the bank account, I was under the impression

6   that that was from the tax return, from his tax return,

7   and -- because he was supposed to be going overseas to study,

8   get more -- a little bit more knowledge on his Islamic dean,

9   that that money was going to be used -- for him to use

10  overseas.

11          I mean, of course, the cost of living is cheaper.

12  So I was going to be in charge of Western Unioning money to

13  him when he travels; but, as you know, that never happened

14  and the funds were wiped out.

15  Q.   And the money at the house, as far as you knew, came

16  from a different place or you just didn't know?

17  A.   I don't know.  Either taxes or his own from his mom.  I

18  don't know.

19          MR. BRODERSEN:  I don't have anything further, Your

20  Honor.

21          THE COURT:  Cross?

22                      CROSS-EXAMINATION

23  BY MR. HANDBERG:

24  Q.   Good morning, Ms. Wills.

25  A.   Good morning.

1  Q.    We've met before, haven't we?

2  A.    Yes.

3  Q.    I met you when you testified before the grand jury,

4  right?

5  A.    Yes.

6  Q.    And in that testimony I specifically asked you whose

7  idea it was for you to be added as a signatory to Mr.

8  Jimenez's account.  Do you remember me asking you that?

9  A.    I don't remember.

10  Q.    But it was your testimony here today that it was Mr.

11  Jimenez who asked you; is that what I heard you say on your

12  testimony?

13  A.    Yes.

14            MR. HANDBERG:  May I approach the witness, Your

15  Honor?

16            THE COURT:  Yes.

17            (Discussion off the record between Mr. Handberg and

18  Mr. Brodersen.)

19  BY MR. HANDBERG:

20  Q.    All right.  Ms. Wills, I've handed you what's been

21  marked as Government's Exhibit Number 7, and I'm going to ask

22  you to turn to page 28, and you recognize that as being a

23  portion of your testimony before the grand jury?

24  A.    Yes.

25  Q.    All right.  I want you to read that page and tell me

1    when you're done with reading it.

2    A.    Aloud or no?

3    Q.    I'm sorry.  Read it to yourself, please.

4    A.    Okay.

5          Okay.

6    Q.    All right.  And does that refresh your recollection on

7    whose idea it was for you to be added as a signatory to the

8    bank account of Mr. Jimenez?

9    A.    It refreshes my memory that my husband had a discussion

10   with me; but it doesn't mean that it was my husband's idea,

11   because in Islam, a man and a woman can't be in the same room

12   together if they're not married.

13         So Jimenez wouldn't have came to me and said, "So

14   and so, can you please put me on my -- get on my account?"

15         It would be my husband that talked to me, because,

16   you know, he's my -- my wali or my guardian, if you will.

17   So. . .

18   Q.    So it would have been your -- Mr. Robertson who would

19   have come to you to ask you to be placed on Mr. Jimenez's --

20   A.    Right.

21   Q.    -- account?

22   A.    Right, but that doesn't mean it was his idea.

23   Q.    Isn't that what you said to the grand jury on October

24   12th of 2011?

25   A.    Yes.

1    Q.    So were you testifying -- were you testifying

2    incorrectly on that day?

3    A.    I don't think I was testifying incorrectly on that day.

4    My son was three weeks old, and I don't know what term there

5    is out there, but I was stressed out, and I wasn't lying.  I

6    don't want you to think I was lying; but definitely I

7    wouldn't think that, you know, it was my husband's idea

8    because he never dealt with any money.

9    Q.    Okay.  But you would agree with me that's what you said

10   in your testimony then?

11   A.    Yes.

12   Q.    That it was Mr. Robertson's idea, correct?

13   A.    When I said this, yes.

14   Q.    All right.  And one of the things that we covered during

15   the course of your testimony were the various envelopes in

16   the house.  Do you remember going over that and talking about

17   the markings on the envelopes, because all of that on those

18   envelopes was your handwriting, correct?

19   A.    Yes.

20         MR. HANDBERG:  Your Honor, may I approach the

21   witness?

22         THE COURT:  Yes.

23         (Discussion off the record between Mr. Handberg and

24   Mr. Brodersen.)

25   BY MR. HANDBERG:

1    Q.   Ms. Wills, I've handed you what's been marked as

2    Government's Exhibits 5-A and 5-B.  Do you recognize those as

3    some of the envelopes that you kept with some of Mr.

4    Jimenez's money?

5    A.   Yes.

6    Q.   And do you recall telling the grand jury that the source

7    of that money was Mr. Jimenez's tax return?

8    A.   I don't remember.  I don't remember the whole

9    conversation.  I'm sure some of it was part of his tax

10   return, but I'm not sure what I said then.  I don't want

11   to -- I don't want to lie about anything.  So I don't

12   remember back in 2011 what I said to the grand jury about

13   these forms, besides what's on here.

14   Q.   All right.  So if you told the grand jury back then that

15   the money was from Mr. Jimenez's tax return, would that be

16   correct?

17   A.   I'm not sure because, as I just stated, I don't remember

18   what I told the grand jury about funds being in the house for

19   his tax return.

20   Q.   Well, do you remember telling the grand jury that you

21   actually had Mr. Jimenez's money in four different places?

22   A.   Yeah, I remember telling them I had them in several

23   different places.  I do remember that.

24   Q.   All right.  So two of the places were these two

25   envelopes, correct?

1    A.    Yes.

2    Q.    And then there was another two that were in other

3    locations in the house, correct?

4    A.    Yes.

5    Q.    And do you remember telling the grand jury that all of

6    that was tax money?

7    A.    No, I don't remember that.

8            MR. HANDBERG:  May I approach the witness, Your

9    Honor?

10           THE COURT:  You may.

11           (Discussion off the record between Mr. Handberg and

12   Mr. Brodersen.)

13   BY MR. HANDBERG:

14   Q.    I've handed you back a copy of your grand jury

15   testimony.  I'd like you to read pages 18 and 19 silently and

16   then tell me when you're done with that.

17   A.    Okay.

18   Q.    All right.  And do you see in those portions of the

19   transcript where you testified and told the grand jury under

20   oath that the money in the four different locations in the

21   house was all tax money of Mr. Jimenez?

22   A.    Yes, I see that.

23   Q.    All right.  And does that refresh your recollection on

24   the fact that that was -- in fact, all that is the tax money

25   of Mr. Jimenez?

1    A.    The paper says -- the paper says so.   I mean, I don't

2    remember.   I don't remember everything.   Like I said, it was

3    a long time ago now.

4    Q.    All right.   But that's --

5    A.    If it's on paper, yes, I said it.

6    Q.    All right.   And that's different than what you're

7    telling us here today?

8    A.    Because I don't remember everything then.

9    Q.    Okay.   So your testimony here today is you don't know

10   the source of all that money?

11   A.    That was in the house.

12   Q.    All right.   And your testimony back in October of 2011

13   was you did know the source and it was Mr. Jimenez's tax

14   money?

15   A.    From what I can recall, yes.

16   Q.    All right.   And from what your testimony was on that

17   day, correct?

18   A.    Yes.

19   Q.    All right.   Now, Mr. Jimenez moved down to Florida in

20   November of 2010?

21   A.    Something around about that time.

22   Q.    And did he stay at whatever house Mr. Robertson was

23   staying at for a night?

24   A.    Yes.

25   Q.    So some nights it would be your house and sometimes it

1    would be Ms. Elhadi's house?

2    A.    Yes.

3    Q.    And when Mr. Jimenez was in Florida, would you cook for

4    him?

5    A.    I did every day, actually.

6    Q.    And you'd help support him?

7    A.    Such as?

8    Q.    Would you do his laundry?

9    A.    No.

10   Q.    No?

11   A.    No.

12   Q.    What else would you do besides cook for him?

13   A.    Just cook.

14   Q.    Provide him a place to stay?

15   A.    Well, yeah.  I mean, you know, a young guy.

16   Q.    All right.  And the first time you learned that Mr.

17   Osias had prepared your tax return is when he showed up to

18   get you to sign it?

19   A.    For that, yes.  Yes.  With regards to signing -- filling

20   out -- doing everybody's taxes, he came to my door.  I don't

21   think my husband was even home, and he was, like, "I need you

22   to sign these papers real quick so I can go to" wherever or,

23   "mail them off so I can get it in time."

24           I didn't look.  I just said, "Okay," and that was

25   it.

1   Q.   All right.  And then at some point did you get the tax

2   returns from Mr. Osias, who had mailed them, for you to

3   distribute to everyone?

4   A.   He e-mailed them to me, actually.

5   Q.   All right.  And what did you do with the return for Mr.

6   Jimenez?

7   A.   What did I do with it?  I just printed everything out

8   just to keep as a record.  I don't know if I gave it to my

9   husband or if I left it on the counter; but that's when I let

10  my husband know, because I had to look at everything and see

11  what was going on with regards to everybody's taxes because I

12  handle the money.  So I told him about it and he was not

13  happy.

14  Q.   You told him that Mr. Jimenez had claimed three of --

15  A.   Yeah.

16  Q.   And Mr. Robertson was not happy about that?

17  A.   Uh-uh, not at all.

18  Q.   Because that's not something that should have happened,

19  should it have?

20  A.   Of course not.

21  Q.   What's that?

22  A.   Of course not.  That's -- that's -- that's -- I mean, I

23  don't know why anybody would do that.

24          MR. HANDBERG:  One moment, Your Honor?

25          THE COURT:  Yes.

1    BY MR. HANDBERG:

2    Q.    And the money in Mr. Jimenez's account, after you were

3    added as a signatory, would Mr. Robertson give you direction

4    on what you needed to do with that account?

5    A.    The only thing he mentioned to me is that "Whenever

6    'Yahyah' goes overseas, that's when I'll let you know when to

7    send him money for the bare essentials."  That was it.

8    Q.    Was it your understanding that was the purpose of that

9    tax refund money?

10   A.    Yes.  That was only -- from what I understand, yes.

11   Q.    And who gave you that understanding?

12   A.    My husband.

13   Q.    And you were added to the account because Mr. Robertson

14   didn't trust Mr. Jimenez to be able to use the money for the

15   right purpose?

16            MR. BRODERSEN:  Objection, Your Honor; calls for

17   speculation.

18            THE COURT:  Overruled.

19   BY MR. HANDBERG:

20   Q.    You can answer the question.

21   A.    Yes.

22   Q.    Thank you.  No further questions.

23            THE COURT:  Yes, sir.

24                    REDIRECT EXAMINATION

25   BY MR. BRODERSEN:

1   Q.   Ms. Wills, I think you've mentioned that when you were

2   called to testify before the grand jury, that you had just

3   had a baby?

4   A.   Yes, I did.  My son was three weeks old.

5   Q.   You had a baby about three weeks before your grand jury

6   testimony?

7   A.   No.  I had -- my son was born a week after my husband

8   was arrested.

9   Q.   Okay.

10  A.   So a month after, you know, he was arrested --

11  Q.   Okay.

12  A.   -- yes.

13  Q.   So the grand jury testimony came some -- a couple of

14  weeks, three weeks after your son was born?

15  A.   Right afterwards.  Like, within two weeks, I was

16  summoned.

17  Q.   And then was this also about the same time that you lost

18  your home and were living with Tony Osias's family?

19  A.   That's right.

20  Q.   Okay.  So that was right about the same time as when you

21  testified before the grand jury?

22  A.   That's correct.

23  Q.   So what was your state of mind during that period of

24  time?

25  A.   Very stressful.  Any mother in here knows how it is to

1    give birth and be stressed out without their husband.  Any

2    single mother out there knows how it is to be stressed out

3    without the man in her life.  So it was beyond belief, to sum

4    it up.

5             MR. BRODERSEN:  I don't have anything further.

6             MR. HANDBERG:  Nothing further from the United

7    States, Your Honor.

8             THE COURT:  Thank you, ma'am.  You can step down.

9             MR. BRODERSEN:  Your Honor, at this point the

10   defense rests.

11            THE COURT:  Any rebuttal, Mr. Handberg?

12            MR. HANDBERG:  No, Your Honor.

13            MR. BRODERSEN:  May Ms. Wills stay in the

14   courtroom, now that she's --

15            THE COURT:  Yes.  The testimony is closed.  So

16   everybody can stay.  Anybody can be here.

17            How does counsel want to handle closing?  Do you

18   want closing arguments?  Do you want to brief it?  Do you

19   want to do it before or after lunch?  I'm at your disposal

20   pretty much.

21            (Discussion held off the record.)

22            MR. BRODERSEN:  Your Honor, my client would prefer

23   that we be allowed to brief the closing argument.

24            THE COURT:  That's fine.

25            Mr. Handberg, is that okay with you?

1              MR. HANDBERG:  Yes, Your Honor.

2              THE COURT:  Well, I mean, you can do both if you

3    want.  However y'all want to represent your clients is fine

4    with me.

5              MR. HANDBERG:  I have no problem briefing it, Your

6    Honor.

7              THE COURT:  Okay.

8              MR. HANDBERG:  And if we do that, I don't think we

9    need to have oral argument.

10             MR. BRODERSEN:  I would agree.

11             THE COURT:  All right.  Then let's talk about the

12   briefing schedule.  Do you want the government and defendant

13   rebuttal?  Do you want simultaneous briefs?  How do you want

14   to handle it?

15             MR. HANDBERG:  I certainly don't think we need

16   government rebuttal like we would do for closing argument.  I

17   think one brief for the United States would be sufficient.

18             THE COURT:  All right.

19             MR. HANDBERG:  What the timing of that is, I'd

20   leave it up to you.

21             THE COURT:  All right.

22             MR. BRODERSEN:  I would prefer to have five days

23   after the government files it's closing brief that I file

24   mine.

25             THE COURT:  That's okay, but if we do it that way,

1    I'm going to allow Mr. Handberg to request a rebuttal brief,

2    if he thinks it's necessary.  That's the only fair way to do

3    it.

4              MR. BRODERSEN:  Right.

5              THE COURT:  So, after seeing your argument, he may

6    change his mind about rebuttal.

7              MR. HANDBERG:  I thought we were talking about

8    doing it simultaneous.

9              THE COURT:  That's why I'm telling him that if he

10   wants to do it that way, you're going to have the right to do

11   a rebuttal.

12             MR. BRODERSEN:  Why don't we do it simultaneous,

13   and that way I'll save Mr. Handberg any additional work.

14             THE COURT:  Well, I'm not interested in saving Mr.

15   Handberg work, but that's fine.  I think that's appropriate,

16   simultaneous briefs.  How long do you want to file them?

17   Sometime this year, preferably.

18             MR. HANDBERG:  I guess that would depend on how

19   long it would take us to get the transcripts.

20             THE COURT:  Well, we can ask Diane --

21             MR. HANDBERG:  She's very expeditious, I know.

22             THE COURT:  We can ask Diane that.  She's going to

23   have a lot of phonetic spellings to deal with.

24             But other than that, when can you get it for them,

25   Diane?

1          THE COURT REPORTER:  Whenever they need it by.  I

2    can have it done within a week.

3          THE COURT:  She can do it in a week with no

4    problem.  Let me get a calendar.

5          MR. HANDBERG:  If anything, because of the budget

6    issues, we've been trying to order things on a regular-

7    delivery schedule as opposed to expedited delivery.

8          THE COURT:  We don't need to pay for expedited

9    briefing.  I'm not suggesting that.

10          Today is the 3rd.  So if she gets you the

11    transcripts by the 12th, do y'all want to file them by the

12    23rd, before Christmas, so you don't have to mess with it

13    over the holidays?

14          MR. BRODERSEN:  That's fine with me.

15          MR. HANDBERG:  That's fine with me, Your Honor.

16          THE COURT:  Okay.  Diane will get you the

17    transcript by the close of business on the 12th.  The briefs

18    are due on Monday, the 23rd of December.  And I'm not going

19    to impose a page limit.  Y'all just take whatever space you

20    need, but not any more than you need.

21          Is there anything else then we need to address

22    before we adjourn the proceeding?

23          MR. HANDBERG:  I don't think so.

24          MR. BRODERSEN:  I don't think so, Your Honor.

25          THE COURT:  All right.  Thank y'all.

1          (Proceedings terminated at 12:00 p.m.)

2                    - - - - - - - -

3                 Reporter's Certification

4    I certify that the foregoing is a correct transcript from the

5    record of proceedings in the above-entitled matter.

6                              s/Diane Peede, RMR, CRR
                               Official Court Reporter
7                              United States District Court
     Date:   December 12, 2013   Middle District of Florida

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25