## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**UNITED STATES OF AMERICA**

**VS.**                                                      **CASE NO: 6:12-cr-63-Orl-31GJK**

**MARCUS DWAYNE ROBERTSON**

---

### SENTENCING MEMORANDUM OPINION

**I.      Preface**

By all accounts, Marcus Dwayne Robertson was a very bad man, one of the leaders of a

criminal gang that committed violent armed robberies in the early 1990s.[1]   By his own account –

which was recited at length to a government informant -- Jonathan Paul Jiminez wanted to be a

very bad man, to commit acts of violence in the service of his religion.   Jiminez told the informant

that Robertson, a former Marine turned Islamic scholar, was training him to commit these acts,

and would soon send him to Mauritania for the next stage.   Robertson acknowledges wanting to

send Jiminez to Mauritania, but denies wanting to help him commit violence.   He says he was

using training and religious instruction to instill self-discipline and a sense of purpose in a troubled

young man, and the trip to Mauritania had nothing to do with terrorism.

Robertson and Jiminez have been convicted of income tax fraud.   Robertson is now before

this Court for sentencing on that charge.   The prosecution contends that the crime was committed

to raise the money needed to send Jiminez to Mauritania to further his terrorism training.   If the

---

[1] The events took place long enough ago that the record is difficult to reconstruct, but it
appears that between 1991 and 1995 Robertson was convicted on charges of violent crime in aid
of racketeering in federal court in New York, criminal possession of a weapon in state court in
New York, and aggravated assault in Pennsylvania state court.   (Doc. 286 at 5)

crime was committed for this purpose, the Guideline sentence increases enormously, from a matter of months to ten years.   To resolve this question, the Court conducted two and a half days of sentencing hearings, with testimony from Robertson and several of his supporters, as well as an FBI agent and a prosecution expert on Islamic extremism.

## II.   Factual Background

Robertson is a 46-year-old Muslim imam and Islamic scholar, who also goes by the name Abu Taubah.   He grew up in New York but now resides in Orlando, Florida with his two wives and 15 children.   (Doc. 286 at 18-19).   He enlisted in the United States Marine Corps in 1986 and was discharged from active duty in 1990.   (Transcript of April 30, 2015 hearing (henceforth, "Tr.") at 22).[2]

From 1991 to 1995, Robertson was incarcerated for his role in a violent crime spree by a gang known as "The Forty Thieves," of which he was a leader.   Robertson personally participated in more than a dozen armed robberies, and shot and killed several men.   (Tr. at 89-91).   After his arrest, he provided substantial assistance to the United States government, resulting in a significant reduction in his sentence.   Robertson contends that he continued cooperating with the government for a number of years thereafter, including while he lived abroad in Mauritania and Egypt.[3]

While living in New York, Robertson met Mustafa al-Hanafi.   Robertson and al-Hanafi traveled to Mauritania in 2002 to study the Arabic language and to memorize the Koran.[4]   Al-

---

[2] It appears from the record that, after serving in the Marine Reserve, Robertson received an honorable discharge in 1994.

[3] Extensive testimony was given in a closed session on April 30, 2015 concerning Robertson's cooperation with the government.   Due to concerns about disclosure of classified information, that portion of the sentencing transcript has been sealed.

[4] Mauritania is a relatively poor Islamic state located in northwest Africa.   The Sahara Desert covers about 90 percent of the country.   Mauritania's population is nearly 100 percent Muslim, and the country enforces extreme restrictions on freedom of religion.   It is one of only a few countries in which atheism is punishable by death.   Modern Standard Arabic is an official

Hanafi stayed about six months before returning to New York.   That same year, Robertson met

Wesley Blake, who also travelled to Mauritania to memorize the Koran.   Blake established a

school in Mauritania – the Darul Arqam.   Aside from a few months living in Senegal in 2006,

Blake has continued to reside and teach in Mauritania since 2002.

In 2010, in part due to the urging of Robertson, al-Hanafi's son, Rasheed Gibbons, travelled

to Mauritania for the same purposes as his father and Robertson – i.e., to study Arabic and

memorize the Koran.   Gibbons returned to the United States in 2014, after successfully

memorizing the Koran.

Robertson lived in Mauritania and Egypt for several years.   He moved back to the United

States in 2006.   After his return to the United States, he travelled extensively, giving lectures on

Islam in the United States, Canada, and Great Britain.   He has written a number of books on

Islamic practices, and many hours of his lectures about Islam have been videotaped and made

available via the Internet.

The Court received 98 letters in support of Robertson from people around the world who

were familiar with his teachings.   These letters can be summarized by a quote from a letter sent

by Muttaqi Khan on behalf of the Muslim Youth Organization in Finland:

> We have been familiar with Mr. Robertson through his lectures that
> can be found on YouTube, prior to him being arrested.   Through
> these lectures, we have found him to be a man of truthfulness, care
> and inspiration.   He has inspired others to become better human
> beings and Muslims.   We have never heard him promote or
> advocate terrorism, or even justify terrorist acts.   Rather, we have
> heard and seen him speak about the true values of the religion of

---

language.   Although nominally a democratic republic, its president, Abdel Aziz, came into power
by a military coup in 2008.

Mauritania is not listed by the State Department as a state sponsor of terrorism, but it is the
subject of a travel warning because of activities by terrorist groups in the region, including al-
Qaida in the Islamic Maghreb ("AQIM").

Islam, e.g. being good to one's parents and battling against evil inclinations within ourselves.

In November 2010, Robertson was joined in Florida by Jiminez, an unemployed 26-year-old single male with an eighth grade education, whom witnesses described as immature and not very bright. Jiminez had a history of mental health problems, drug use, and an unstable home life. (Doc. 286 at 10). He had been shot in the head, had been prescribed an anti-psychotic medication, and had been placed in five different mental health facilities. (Doc. 286 at 10).

Jimenez was a friend of al-Hanafi's son, Gibbons. Both Robertson and al-Hanafi had known Jiminez since the early 1990s, and they said they felt an obligation to try to help a struggling fellow Muslim. According to al-Hanafi, who described Jiminez among other things as "illiterate," the plan was for Robertson to teach Jimenez social and reading skills, and help him obtain a GED, in preparation for sending him to Mauritania to study Islam and Arabic with Gibbons at Blake's school. Al-Hanafi said that they believed it would be easier to help Jiminez overcome his drug problem and other issues in Florida, away from his drug-using friends and other bad influences.

Jiminez stayed with Robertson, living in his garage, for seven months. In June 2011, after Robertson found out that Jiminez was sneaking out at night, going to clubs and doing drugs, he sent him back to New York, where he was ultimately arrested.

## III.    Legal Background

On February 14, 2011, a 2010 federal income tax return was prepared for Jiminez by Tony Osias, a friend of Robertson's. The return reflected business income of $15,500 and three dependent children, resulting in a tax refund of $5,587. Jiminez was shown to be living at Robertson's address, and the document was filed from Robertson's computer. The return was false: Jiminez had not earned $15,500 in business income, and the children claimed as dependents were Robertson's, not his.

Robertson was arrested based on an unrelated charge on August 23, 2011 and has remained in custody since then.[5]   On March 14, 2012, based on the false income tax return, Robertson and Jiminez were indicted and charged with conspiracy to defraud the United States in violation of 18 U.S.C. § 286.   (Doc. 1)   Jiminez was also charged with lying to the FBI.   (Doc. 1).   Jiminez pled guilty to both charges.   At Jiminez's sentencing, based on numerous recorded conversations between him and the informant, the Court applied the § 3A1.4 terrorism enhancement.[6]   As a result, Jiminez was sentenced to a term of 120 months.   (Doc. 154).   During his allocution, Jimenez accepted responsibility for all the "stupid" things he told the informant, but he consistently and steadfastly denied attributing any criminal or violent intent to Robertson.

Following a bench trial on December 3, 2013, the Court found Robertson guilty of the income tax fraud charge.   (Doc. 237).

### IV.     The Scoring

U.S. Sentencing Guidelines Manual § 2B1.1 provides a base offense level of 6 for the violation of 18 U.S.C. § 286.   The amount of the loss, $5,587, requires an addition of two levels,

---

[5] Robertson's arrest involved a charge of possession of a firearm and ammunition by a convicted felon in violation of 18 U.S.C. § 922 (g)(1).   (Doc. 1 in Case No. 6:11-cr-277).   He pled guilty to that charge on January 5, 2012 (Doc. 36 in Case No. 6:11-cr-277) and will be sentenced to a term of 12 months and 1 day.   (Doc. 107 in Case No. 6:11-cr-277).

[6] Counsel for Jimenez did not object to application of the terrorism enhancement, which resulted in a sentencing guideline range of 151-188 months.   The terrorism enhancement is discussed in greater detail *infra*.

resulting in an offense level of 8.  Robertson's criminal history places him in category II.[7]  A

Guideline score of 8-II suggests a sentencing range of 4-10 months.[8]

Thus, under normal circumstances, the Court would sentence Robertson to a term of several

months for his violation of 18 U.S.C. §286, to run consecutive to the 12 months and one day

sentence imposed for the felon-in-possession conviction in Case Number 6:11-cr-277.  Because

Robertson has already been incarcerated for more than three years, this would result in a sentence

of time served.

## V.    The Terrorism Enhancement

However, this is not a normal case.  The prosecution seeks imposition of the terrorism

sentencing enhancement, U.S. Sentencing Guidelines Manual § 3A1.4, which provides that if the

offense is a felony "that involved, or was intended to promote, a federal crime of terrorism," the

Guideline score is increased by 12 levels, or to level 32, whichever is greater, and the defendant's

criminal history category is increased to level VI.  If the terrorism sentencing enhancement were

to be applied in this case, it would take Robertson from a Guideline score of 8-II to a 32-VI, with

a resulting recommended sentence of 120 months.[9]

---

[7] The Presentence Report ("PSR") scores Robertson, before enhancement, at a criminal history Category I.  (PSR, para. 53).  However, the PSR was drafted when the Court was considering the gun charge (discussed in footnote 5) and the tax fraud charge together.  For reasons not pertinent to this opinion, the Court opted to consider those charges separately.  Because of this, the conviction on the gun charge must be added to Robertson's criminal history, resulting in two criminal history points, which puts Robertson in criminal history Category II.

[8] This score falls within Zone B of the sentencing table, meaning the Court would have the option of imposing a sentence of community confinement or home detention, rather than imprisonment, for all but one of the 4 to 10 months.  U.S. Sentencing Guidelines Manual § 5B1.1 cmt. 1(A).

[9] A score of 32-VI results in a Guideline sentencing range of 210-262 months.  However, the statutory maximum sentence for a violation of 18 U.S.C. § 286 is 120 months.  Thus the Guideline sentence in this case would be 120 months.

According to the prosecution, the terrorism enhancement applies because the fraudulent tax refund was intended to support "the operation of a travel facilitation network, with members in New York and Orlando, that sends individuals overseas, specifically to Mauritania … to commit violent jihad."[10]   (Doc. 91 at 2).    With regard to the latter allegation, the prosecution argues that Robertson spent seven months instructing Jiminez in, among other things, "killing, suicide bombing, and identifying and murdering United States military personnel … to advance the cause of violent jihad."   (Doc. 91 at 2).

U.S. Sentencing Guidelines Manual § 3A1.4 cmt. n.1, defines a "federal crime of terrorism" by reference to 18 U.S.C. § 2332b(g)(5), which states that the crime (1) must be an offense that is calculated to influence or affect the conduct of government by intimidation or coercion or to retaliate against government conduct, and (2) must constitute a violation of one or more of a list of enumerated federal criminal statutes.   As to the second element, the Government contends that the income tax fraud was committed to further a violation of 18 U.S.C. § 956(a)(1), which prohibits conspiracies to murder, kidnap, or maim persons abroad, or of 18 U.S.C. § 2339A, which bars the provision of material support to terrorists.   Both of these statutes are on the list of enumerated federal crimes.

Where, as here, a defendant objects to a factual finding that is used in calculating his guideline sentence, the prosecution bears the burden of establishing the disputed fact by a preponderance of the evidence.   *See, e.g., United States v. Rodriguez*, 398 F.3d 1291, 1296 (11th

---

[10] "Jihad" is an Arabic word meaning "struggle."   In Islam, the term can be used to refer to two different types of struggles:   "greater jihad," an inner spiritual struggle against sin, and "lesser jihad," the outer, physical struggle against the opponents of Islam.   Many Muslims believe that lesser jihad does not necessarily involve warfare or acts of terrorism, but there are some who see such violence as necessary.   The remainder of this opinion will use the term "violent jihad" to refer to this latter form of lesser jihad.

Cir. 2005).   Thus, for the terrorism enhancement to apply to Robertson's sentence, the prosecution

must demonstrate by a preponderance of the evidence that Robertson intended that the proceeds

of the tax fraud be used to promote a violation of 18 U.S.C. § 956(a)(1) or of 18 U.S.C. § 2339A

for the purpose of intimidating or coercing some government or retaliating against it.   After

careful review, the Court finds that the prosecution has not met that burden.

## VI.      Analysis

The question of whether the terrorism sentencing enhancement should be applied boils

down to a dispute over the intended purpose of Jiminez's trip to Mauritania.[11]   Robertson contends

that the purpose of the trip was entirely peaceful – for Jiminez to study Arabic and memorize the

Koran.   The prosecution contends that Robertson spent the seven months while Jiminez was in

Florida training him and grooming him to engage in violent jihad, and that the trip to Mauritania

(to be financed with the proceeds of the income tax fraud) was to be in furtherance of this process.

In addition to pointing out the Defendant's criminal history with the Forty Thieves, discussed

*supra*, the prosecution relies on the following evidence to show that the objective of the Mauritania

trip was violent extremism rather than peaceful study and instruction.

### A.      Robertson's library

The prosecution argues that Robertson holds extremist religious views and that proof of

this was found on his computer, which was seized when Robertson was arrested.   Specifically,

the prosecution points out that Robertson's computer contained copies of roughly 20 works

authored by militant Islamic extremists such as Anwar al-Aulaqi, a leader and recruiter for al-Qaeda;

Abu Hamza, a cleric who encouraged fighters to join al-Qaeda and is currently serving a life sentence

---

[11] Though he denied having participated in income tax fraud, Robertson has always
acknowledged that proceeds from the income tax return were to be used to finance Jiminez's
overseas travel.

in federal prison on numerous terrorism charges; and Abu Muhammad al-Maqdisi, reputedly the most influential living jihadi theorist.

It is true that these works espouse extremist beliefs and justifications for the commission of violence in the (putative) service of Islam.   Several of the works describe the United States as a great oppressor of Islam; others exhort believers to fight or kill heretics or those who do not follow Islamic law; and some argue that democracy is not in accord with Islam.

But what the prosecution has failed to show is that Robertson shares these extremist beliefs. The 20-or-so works were part of a 10,000-document Islamic library accessible via Robertson's computer.   There was no evidence produced that Robertson ever accessed these particular documents, much less that he took their extremism to heart.   Even if the prosecution had shown that Robertson actually read the works in question, it would provide little support for application of the terrorism enhancement.   The Government has never disputed Robertson's claim of being an Islamic scholar.   It is not at all remarkable for an Islamic scholar to study, among many, many others, the writings of Islamic extremists.

### B.      Jiminez's recorded conversations

Shortly after arriving in Florida, Jiminez made the acquaintance of an individual who, it turned out, was already a government informant.[12]   In numerous (recorded) conversations with the informant, Jiminez discussed his desire to engage in violent jihad and fight for Islam overseas and described how Robertson was preparing him to do so.   Roughly a third of the prosecution's sentencing memorandum is devoted to recounting these conversations, such as the following:

> On January 24, 2011, in a recorded conversation, Jimenez stated that
> ROBERTSON wanted Jimenez to learn about Islam first and then
> ROBERTSON would teach Jimenez how to kill.   At that time,

---

[12] FBI agent Robert Manson testified that the United States had been investigating Robertson prior to Jiminez's arrival in Florida.   (Tr. 173).   The record does not reflect whether the informant who befriended Jiminez was part of this earlier investigation.

ROBERTSON believed that Jimenez was still a "tadpole" who would continue to study under ROBERTSON until ROBERTSON decided that Jimenez was ready to travel overseas. Jimenez explained how ROBERTSON was providing him paramilitary-style training to include tactical entry and room clearing as well as troop leading procedures. Jimenez stated that ROBERTSON was training Jimenez on "kill moves," such as the "guillotine choke." As part of Jimenez's training, ROBERTSON warned Jimenez about the possibility of law enforcement coming to get Jimenez and the need to be able to "take them n_____ out."

On January 29, 2011, in recorded conversations, Jimenez discussed his desire to die as a martyr in violent jihad and noted that it is better to fight for the cause of Allah than to make hajj (pilgrimage to Mecca), but doubted his readiness to do so ("I don't feel content to die right now and that's not good." Jimenez stated that he planned on returning to New York and traveling to Saudi Arabia to make Umrah. Jimenez would then return to receive "another lesson" from ROBERTSON before departing for Mauritania. Jimenez stated that his goal is "[t]o study and one day fight. [Arabic saying], die on the battlefield." Jimenez expressed a desire to learn how to be "dangerous" with the knife and "how to cut somebody up." According to Jimenez, ROBERTSON was teaching Jimenez the basics of knife fighting. ROBERTSON told Jimenez that he was "gonna learn weapons," but that ROBERTSON wanted him to become "deadly" with his hands prior to learning how to fight with weapons.

On January 31, 2011, in a recorded conversation, Jimenez expressed his desire to see action in battle and to die on the battlefield where all of his sins will be forgiven:

> I don't just want to be in the battle, I want to die on the battlefield, but I don't mind going through a few battles [laughing]. You know I don't know when the Lord is going to take my soul, but at least let me . . . they say when you hit the dirt, not even when you fight B, when you hit the dirt all of your sins are forgiven. When your feet touch that battle - grizzie sins are [Jimenez makes noise].

(Doc. 285 at 9-10) (capitalization, redaction, and bracketed material in original).

The quoted passage is typical of the remainder of this portion of the prosecution's

sentencing memorandum: Jimenez makes extravagant claims about his ongoing transformation

into a holy warrior and describes how Robertson is aiding this metamorphosis, but provides little

concrete information that could be used to determine whether he was telling the truth or simply putting on airs to impress his new friend.   Some of Jiminez's claims are obviously overblown. For example, despite its ominous-sounding name, the "guillotine choke" is a common martial arts technique, routinely employed (in non-lethal fashion) by practitioners of Brazilian jiu-jitsu.[13] Some of Jiminez's claims appear to devolve into gibberish, as with his discussion of "grizzie sins". (Doc. 285 at 10).

More pertinent is the fact that there is no evidence to support the more significant claims Jiminez made about Robertson – e.g., that Robertson ever taught him to apply a guillotine choke, or to be dangerous with a knife, or to be able to "take them n_____ out."   None of the evidence produced by the Government shows Jiminez discussing knife fighting or guillotine chokes or the like in sufficient detail as to suggest that he actually obtained any proficiency in these areas.   The same holds true for most of the rest of Jiminez's recorded conversations.   Jiminez claimed that Robertson was teaching him United States military rank structure, but the closest thing to evidence that this occurred is Jiminez claiming he was told to kill officers first, because they direct the enlisted personnel and send them into battle, and that he should kill generals, because they "can lead an army."   (Doc. 285 at 11-12).   Other such claims – that Robertson was training him to handle and conceal weapons (Doc. 285 at 12), that Robertson taught him how to obtain a firearm if necessary (Doc. 285 at 12-13), and that Robertson was training him "on how to transition from a firearm to a knife when close to an enemy" (Doc. 285 at 13) lack even this minimal substantiation.   And the same is true of the most serious claims.   For example, Jiminez told the

---

[13] For example, at UFC 188, a nationally televised mixed martial arts competition held on June 10, 2015, three of the eleven fights on the card were decided by guillotine choke.  Nate Wilcox, *UFC 188 results: Full fight card winners and reaction from Velasquez vs. Werdum*, SB Nation (June 14, 2015, 12:15 AM),   http://www.sbnation.com/2015/6/14/8776635/ufc-188-fight-results-velasquez-werdum.

informant that he had been informed, by Robertson, that suicide bombing was permissible under certain circumstances, such as if one could "go to a place where there's seven top generals". Nothing else in the record suggests Robertson made such a statement.[14]

It is clear from the recorded conversations that Jiminez wanted his friend to believe that he was in the process of becoming – to use the vernacular – a badass.   But there is almost no support for the notion that Robertson was helping him to do so.

### C.      Miscellaneous

The remainder of the evidence presented by the Government on this point does not merit a great deal of discussion.   A few examples:

• The prosecution argues that Robertson once told the FBI that he "served as personal protection for the Blind Sheikh, Omar Abdel-Rahman"[15] (Doc. 285 at 3), but Robertson says this is a distortion.   He claims he merely told the FBI that, on one occasion, when Abdel-Rahman was giving a public lecture, a small group of individuals from Yemen threatened to assault him; as a result, Robertson and other members of the crowd assisted Abdel-Rahman out of the building and into a cab.

• The Government points out that, about ten days after Jiminez arrived in Florida, someone (presumably Robertson) used Robertson's computer to do a Google search for the origin of the word "assassin."   This is even less noteworthy than the fact that Robertson had access to some extremist texts on his computer.

---

[14] During Jiminez's stay in Florida, al-Hanafi talked with him by phone numerous times; Jiminez never mentioned anything about violence or receiving weapons training or anything of that nature.   (Tr. 249).

[15] Abdel-Rahman, a militant Islamist, was arrested in 1993 and is serving a life sentence for conspiring to commit acts of terrorism.

• On two occasions shortly before Jiminez left Florida for New York, Robertson was taped describing Jiminez as being "ready to die".   The prosecution interprets these statements to mean that Robertson believed that Jiminez was prepared to engage in a suicide bombing or some other terrorist act that might cost him his life.   However, in the recorded statements, Robertson never suggests that Jiminez has become so well trained or so indoctrinated that he was now willing to sacrifice himself for his religious beliefs.   Rather, when Robertson's statements are considered in context, it is at least as likely that Jiminez was being described as someone with no purpose in life – *i.e.*, nothing to live for – which was what Robertson and al-Hanafi said they were trying to provide.   For example, in a recorded phone conversation with an unidentified individual, Robertson said

> I wanna send [Jiminez] to make Umrah[16] because you know, if he's
> gonna die, I asked the sheikh the other day I said what do we do?
> He said if he's ready to die then send him to Umrah, so he can make
> sure that he at least fulfills his obligation to his Lord.   You know?

(Doc. 285 at 21).   The statement is somewhat ambiguous.   Nonetheless, it is difficult to imagine Robertson holding a belief, as the Government would have it, that Jiminez had become so committed that he was willing to sacrifice his life for Islam, with this statement that Jiminez needed to make Umrah so as to "at least fulfill[] his obligation" to Allah before he died.

The remainder of the evidence relied on by the prosecution is similarly inconsequential or, in many cases, is consistent with Robertson's version of events.   For example, the prosecution asserts that Robertson revealed his extremism and his true feelings about the United States during a phone conversation taped on May 25, 2011, when he stated:

> Every, every tornado that comes over there is to destroy that place.
> May it destroy the land of the disbelievers. And the people that are

---

[16] The Umrah is a voluntary pilgrimage to Mecca that Muslims can perform any time during the year – in contrast to the Hajj, a compulsory pilgrimage that can only be performed during the last month of the Islamic calendar.

> living in the land of the disbelievers, what's the ruling on them if they get destroyed with the kuffar?[17] They shouldn't have been there if they could leave. You know?

(Doc. 285 At 5).   At the sentencing hearing, Robertson stated that this was a phone conversation with his ex-wife, who had called to complain about his failure to check on her well-being after a tornado touched down in Missouri.[18]  (Tr. at 115-116).   Robertson said her call exasperated him, and he wanted to get under her skin.   So he referred to an event that occurred years earlier in Egypt, while they were still married.   Robertson and his then-wife saw a group of old people who were praying during a sandstorm; when asked what they were praying for, the group said they hoped the sandstorm "picks up water, turns into a tornado, and destroys the land of the kuffar."   (Tr. at 116).   Robertson said he thought that it was amusing, and remembered it, and subsequently tried to use it to irritate his former spouse.

> In the context of the conversation, she calls me right before I'm going in class. And she tells me that Missouri has – now, this lady has tortured me. Everybody's ex-wife tortures them.
>
> And she tells me that I didn't call her because – you know, when I heard about the tornado and everything.   And I said to her, "Oh, yeah, I'm hoping and I'm praying that it tears up the land of the kuffar.   I hope it tears the whole place up."
>
> I'm digging on her. I'm digging on her to get under her skin.
>
> And she says, "What? There's Muslims there."
>
> And I said, "That's right."
>
> And then I catch on that she doesn't remember. . . .   And so I say to her, "What? You don't remember? … You're forgetting the understanding of the old people."
>
> …

---

[17] "Kuffar" is an Arabic term meaning "disbeliever" or "infidel".

[18] According to the National Oceanic and Atmospheric Administration, an EF-5 tornado hit Joplin, Missouri on May 22, 2011, leaving an estimated 157 people dead.   NOAA, *2011 tornado information,* http://www.noaanews.noaa.gov/2011_tornado_information.html   (last visited June 19, 2015).

> [T]hat's a conversation I had with my wife. That doesn't prove that
> I want to kill anybody. I'm praying for a storm? That's my bomb?

(Tr. at 116-117).   Although a bit hard to follow, Robertson's explanation makes at least as much sense, in context, as the prosecution's interpretation of the phone conversation.

### D.      The evidence one would expect to find

As discussed *supra*, Robertson has spent years writing books, giving public lectures and recording videos, providing a rich source of information about his religious beliefs.  But the prosecution has not produced one statement from Robertson himself advocating violent jihad or praising those who commit terrorism.[19]

Moreover, FBI Agent Robert Manson testified that Robertson was being investigated even before Jiminez arrived in Florida.  (Tr. at 188).  The phones of Robertson and Jiminez were tapped from January 2011 until Robertson's arrest in August 2011.   And Robertson's conversations with the informant were also recorded and, after Robertson's arrest, his computer was seized and searched.    During the course of this surveillance, Robertson was caught on tape making incriminating statements in regard to the tax fraud.  But there are no such statements having anything to do with terrorism.

The prosecution never explained what Jiminez was going to do once he arrived in Mauritania – be it religious indoctrination, additional weapons training or an actual act of terrorism.   The prosecution did not present any evidence of Robertson trying to make contact with

---

[19] Obviously, it is possible that Robertson has been lying about his beliefs, and his years of denouncing terrorism are merely a ruse.  If so, one would expect that a man who has worked so diligently to distance himself, in public, from terrorism would want to maintain the façade by distancing himself from the terrorist he was recruiting and training.   Robertson, however, allowed Jiminez to live in his home for seven months, making no effort (so far as the record shows) to keep their relationship a secret.   In fact, just the opposite occurred: Robertson allowed Jiminez to list Robertson's address on his federal income tax return and to include three of Robertson's children as dependents.

a terrorist group or training camp.  In fact, the prosecution never produced any evidence that terrorist training camps exist in Mauritania.   On the other hand, both Blake and Gibbons testified that through most of 2011, they expected that Jiminez would be joining them at Blake's school, for entirely peaceful study.   The prosecution never suggested that Blake or his school had any connection to al-Qaeda or terrorism.

As discussed above, the terrorism sentencing enhancement only applies if Robertson were intending to support a "federal crime of terrorism."   To qualify as a "federal crime of terrorism," the crime must be one that is "calculated to influence or affect the conduct of a government by intimidation or coercion or to retaliate against government conduct."   U.S. Sentencing Guidelines Manual § 3A1.4.   In this case, the prosecution has not produced any evidence as to which government Robertson wanted Jiminez to influence, affect, or retaliate against, or how he intended to do so.   And Jiminez's many recorded conversations do not support the prosecution on this point.   Jiminez repeatedly stated that he hoped to become a martyr but, so far as the record reflects, never stated that he wanted to do so while targeting any particular government.

## V.      Conclusion

The prosecution has taken snippets of information from various sources, out of context, to weave together a narrative of terrorist ideation by Robertson.   Notwithstanding the vast investigative resources of the United States, and years of effort, the prosecution's proof is woefully inadequate.   The Court finds that the prosecution has not even come close to proving by a preponderance of the evidence that Robertson's relatively minor income tax fraud was intended to promote a federal crime of terrorism.   Thus, the enhancement suggested by United States Sentencing Manual § 3A1.4 does not apply, and the Court will sentence Robertson based on a guideline score of 8-II.

**DONE** and **ORDERED** in Orlando, Florida on June 25, 2015.



GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

United States Marshal
United States Attorney
United States Probation Office
United States Pretrial Services Office
Counsel for Defendant